## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| Molly L. Dennis, | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | Case No:   24-CV-00426 (PJS/DLM) |
| v. | |
| City of Rochester, Kim Norton, in her individual as well as official capacity as the mayor of the City of Rochester, and Patrick Keane, in his individual as well as official capacity as a City or Rochester Council Member, | |
| Defendants. | |

RECEIVED
MAR 0 7 2024
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

SCANNED
MAR 0 7 2024
U.S. DISTRICT COURT ST. PAUL

I am the plaintiff, Molly Dennis, and for this legal document I will refer to myself in the 3rd person as "Dennis", for my First Amended Complaint pursuant to Rule 15(a)(1)(B), states and alleges upon knowledge, information, and belief as follows:

### FACTS

1.   At all times relevant herein, Dennis was a member of the Rochester City Council ("City Council") and, in that capacity, was an employee within the meaning of state and federal statutes because the Defendants, and each of them, as well as the unelected employees and agents of Defendant City of Rochester ("the City"), treated her as an employee and not as an elected public official.

2. At all times relevant herein, Defendant Kim Norton ("Norton") was the Mayor of the City of Rochester.

3. At all times relevant herein, Defendant Patrick Keane ("Keane") was an elected member of the Rochester City Council.

4. The City treats its City Council members as employees by regarding them as full-time employees with wages equal to or similar to those of non-elected City employees, with an annual salary of over $54,000 Councilmembers earn similar wages to many governmental employees. Other elected public servants agree. In a recent Chamber of Commerce training on 22 February 2024, for example, a current Olmsted County Commissioner stated that Rochester City Council members' *"pay and work is equivalent to a full-time employee."*

5. City Council members perform intentional and beneficial work for the City the same as unelected city staff are paid to perform. In essence, they accomplish tasks that are identical or similar to the City's unelected department employee positions (*e.g.,* answering city emails and questions of citizens, taking phone calls to give information to residents, researching issues in all departments, advertising for the City on social media, etc.).

2

6. Dennis's work on the City Council is equivalent or similar to the tasks performed by other unelected department employees who have the same job functions. She goes door-to-door for public engagement, dispensing city department information, and initiates listening sessions in conjunction with City staff, such as for traffic calming measures, these tasks are similar to many other City staff. In addition, Dennis meets with City staff in the community to inform the public of various important issues (like installing or repairing playground equipment, road changes, crosswalks, taking photos of potholes to report to departments, etc.). Dennis works on an equal basis with unelected City staff exploring ideas for improvements and follows their advice. Like other unelected City staff, Dennis is issued a City laptop, City parking decal, official City nametag, City insignia business cards, and a official government City badge/keycard which can access city buildings and areas similar to other City employees. She can use the "staff only" breakroom and restrooms, uses employee forms which label her an "employee", can purchase City logo apparel, gets City discounts, and can access restricted areas such the County building and City Hall after hours for work, has access to the mailroom and other governmental areas accessible by unelected City staff. Dennis can reserve City conference rooms, schedule work meetings

3

with unelected City colleagues, and has an office located in City Hall, similar to many other unelected City team members.

7. Dennis attends legislative functions, informational meetings, teambuilding training, and represents the City in indoor and outdoor community booths the same as other unelected City employees. She also attends committee meetings being the spokesperson for City updates and reports back to City Council and staff just as unelected City staff are paid to do.

8. Dennis is mandated to attend planned City Council meetings that are scheduled and have an agenda planned by the City Administrator, like other unelected City staff. Dennis cannot change the times or locations of these meetings in the same way unelected City staff do not have the ability. Similar to unelected City employees, failure to attend these required meetings could result in the loss of her position.

9. The Internal Revenue Service (IRS) considers Dennis equal to that of unelected City employees, and she is taxed in the same way. In addition to a full-time wage, Dennis receives paid health benefits like full health insurance, dental, and vision coverage just like other unelected full time City employees. Dennis also receives life insurance, disability insurance, and retirement benefits through the as do other non-elected full time City staff.

4

This includes Public Employee Retirement Association (PERA) benefits similar to other unelected public governmental employees.

10. There is not a separate Human Resources for Dennis or other elected officials, and they are treated no differently by the City's Human Resources (HR) Department with respect to their claims for harassment, discrimination and other employee-related personnel issues. Within the City's HR department, Dennis has a file titled *"Employee"* just like every other unelected City employee and uses official employee forms for instances such as travel reimbursement, signing her name under *employee*. Dennis has also used the Employee Assistance Program (EPA) the same as all city employees have access to and her paychecks have an employee number. Dennis was instructed she needs to abide by the same employee policy manual located within the HR online employee network: "Rochester @ work" as other unelected City employees must follow (e.g., technology usage, City organizational policies, and code of employee conduct (e.g., addressing conflicts of interest, disclosure information, and gifts etc.).

11. Dennis was disciplined at work by unelected City staff similar to the reprimand process and subjected to an employee performance evaluation, similar to that of other unelected City staff. One such employee evaluation occurred on or about 20 June, 2022 where Dennis was reprimanded

5

by City Administrator Alison Zelms ("Zelms") and City Attorney Michael Spindler-Krage ("Spindler-Krage") who issued an official written disciplinary list of steps. Dennis was reprimanded for symptoms of her disability and in the same fashion the City Administrator would reprimand her own subordinate unelected City employees. Zelms followed the employee manual's Organizational Policy Disciplinary Action (page 3) starting with progressive disciplinary steps: "A. Documented Verbal Warning" which was done in front of witnesses followed by "B. Written Reprimand" in an official document just as Zelms would do with her unelected City staff. Later other steps of the employee manual were followed similar to suspension (probation) through a harshly restrictive censure which was intended to even further demote Dennis from her elected status to City employee. Spindler-Krage and Zelms also followed the employee manual (page 4) when they cherry-picked a City-funded investigator, whose law firm advertised at annual League of MN City (LMC) conferences as defending government agencies against employee lawsuits. This City hired defense attorney also followed the employee manual by meeting with Dennis for the "purpose of gathering information for an investigation" that would support the City's recent disciplinary actions. The City funded investigators report, summited on or about the 9th of June 2023, chose to interview only two staff Spindler-

6

Krage and Zelms and its findings contained unfounded information that was nearly all subjective, misleading, or provably false. Comparing the report to the interview audio recording alone proves that information in the report is not accurate. Not only was the investigation funded by the Defendants, however by assessing and sharing Dennis' individual data, such as her ADA medical information from her HR employee file, continued to follow the protocol of reprimanding as an unelected City's employee.

12. At all times relevant herein, Dennis suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), a recognized disability under state and federal law. Dennis openly disclosed her disability prior to starting her position on or about the 1st of January 2021. Soon after taking office Dennis filed her official medical ADA accommodation letter which was authored by medical staff at Mayo Clinic. Even with an official list of reasonable accommodation, the City failed to provide basic accommodation, such as the reasonable request for a hourly break. Instead of accommodating Dennis, the Defendants punished her for having a disability and made it harder for Dennis to perform basic functions of her job (e.g., limiting verbal in-person communication, preventing Dennis from meeting with essential City staff, and restricting access to once easily accessible information/resources)

7

13. The Defendants, together with their employees and agents, have intentionally discriminated against Dennis on account of her disability by, *inter alia*, reprimanding and punishing her for symptoms of her federally protected disability. Symptoms discriminated against such as difficulty focusing, short attention span, struggle with linear processing and working memory, executive functioning deficit, fidgeting and wide hand gestures, time "blindness", impulsivity, hyperactivity, and other well-known characteristics of ADHD. A severe criticism of Dennis by the Defendants is that *"she wastes staff time"* example given was Dennis asks too many questions. The requirement of needing additional time for processing, explaining, and clarifying information is a common consequence of people diagnosed with a learning disability. Neurodevelopmental processing disabilities, such as ADHD or Autism, often require additional information and explanation for understanding, Dennis was punished for literally asking questions needed to do her job.

14. On or about 6 March 2023, the Defendants censured Dennis for her actions and behaviors that were directly caused by and related to her ADHD disability as noted above. The March 6th censure with unfounded claims and subjective language was approved by City staff and brought to City Council by Keane in a public ambush to shame and chastise Dennis.

8

The harshly restrictive censure was presented without prior warning, publishing in the Council packet or any knowledge citizens or Dennis this was going to occur. Not only did this unprecedently harsh and restrictive censure blindsided Dennis, it was also issued without required public notification and without following due process. This clearly improper and probably illegal censure imposed severe restrictions that had the intended consequence of silencing, controlling, and further demoting Dennis to employee status. In addition, the March 6th censure has prevented Dennis from carrying out her constitutional and statutory duties as an elected public official. For example, Dennis, unlike any other council members, was prohibited from directly asking questions to over 900 City staff members. According to the March 6 censure, Dennis was not allowed to talk to any City staff, except a dozen or so Department heads, restricting the discussion of any city issue for over nine months. The censure also implied Dennis could not criticize the government or policy in Council meetings as the censure forbids "negative interactions" with Council or City staff. When asked, she was informed by Spindler-Krage that the constitutional right to free speech did not apply to her when she was being punished. This gag-order censure did not allowed Dennis to talk about anything City related topic with nearly a thousand City employees (e.g., on the phone or in person with any librarians, park staff,

9

City bus drivers, police officers, firefighters, public utilities, community development, public works, front desk staff in any city building including City Hall, etc.) Dennis had to leave community events, avoid locations, excuse herself from neighborhood discussions with residents in her ward when discovering a resident was a city employee. Obtaining accurate and timely information is a critical function of any elected official, normally done by all councilmembers, to understand complex city issues and respond to concerns from constituents. Historically when an elected official is censured, it is a verbal reprimand of disapproval, this March 6th censure however had outrageous and disproportionate restrictions which hindered her ability to do her job at work as well as function in her personal life. Based on the symptoms of Dennis's protected disability she was harshly censured and punished.

15. Zelms, Spindler-Krage, and Norton in retaliation to Dennis speaking up against the discriminating censure, all refused to continue to meet with Dennis. Zelms stated in writing Dennis was even blocked from all communications with her. All three individuals above continued to ostracized Dennis from important conversations and dismissed her City questions without answering (e.g., rejected requests for basic City budget data, background information on City issues/policies, resident inquiries etc.). If Dennis received a question from a citizen, for example an inquiry concerning

city legal matters, Dennis was ordered to follow a strict regimen to get the answer. Ordered in writing by the City Attorney, Dennis was required to hand-write/type the question on a sheet of paper, she must place the paper in an envelope, travel to the Government Center downtown, and place the envelope into Spindler-Krage's City Hall mailbox. If these steps were not followed the City Attorney would not respond to the question Dennis asked. These detailed instructions were sent solely to Councilmember Dennis, no other Council members were required to jump through such cumbersome and demeaning hoops for the basic requirements for their job.

16. Another example is when Zelms sent Dennis an official government email on the 26th of December 2023, just days before the censure was to expire. The Dec 26th email was address to only Dennis but forward to the entire City Council, Norton, and numerous City leadership staff containing new stringent rules that would place even further restriction on how Dennis would be allowed to communicate with City staff in 2024 and beyond. Without approval from City Council the highest-ranking City staff, the City Administrator added more controls to Dennis's freedom of speech, limiting access to needed information, and restraining essential job functions indefinitely. The March 6th censure ended on Dec 31, 2023, however unelected City staff were now still instructed to continue to punish and restrict Dennis.

Zelms has restricted Dennis communication and activities for year and continues to treat and reprimand Dennis as if she was another City employee. Zelms' Dec 26 email controlled what topics Dennis is allowed to discuss, the lengths of staff interaction, and means by which Dennis is allowed for meetings. Zelms' was made aware that Dennis processes information most effectively verbally and intentionally restrict the way Dennis was able to obtain information due to her disability with the email stating, *"The meetings will occur virtually unless the designee or I approve an exception."* These controlling, undermining, and retaliatory restrictions further demoted Dennis to the equivalent of Zelms subordinate unelected City staff.

17. Even though both Spindler-Krage and Zelms are unelected City staff, they retain, by requiring this convoluted and humiliating process and harsh regulations, sole authority over whether Dennis can ask a question of other City employees, what topics/policies are permitted to get information on. In this way, as well as <u>many</u> others, employees and agents of the City of Rochester have exercised and continue to exercise direct control over an elected city official, in effect negating the votes of the persons who voted for Dennis in the most recent city election.

18. Dennis has frequently and repeatedly complained to Defendants, as well as their employees and agents, about their intentional discrimi-

nation against her on account of her disability. None of Dennis' complaints have resulted in any retraction of discriminating behavior against Dennis or remedial action to accommodate Dennis's disability. The action Defendants have instead taken is to have hired a captive law firm to whitewash their discriminatory actions and the Defendants' own bad behavior. And, as a result of said complaints, the Defendants have repeatedly engaged in reprisals and retaliation against Dennis making it virtually impossible for her to discharge her duties as an elected public official. In one unusual and highly reprehensible form of retaliation, Spindler-Krage saw to it that unverified and defamatory averments made by Dennis's ex-spouse in a dissolution proceeding were widely published as though they were true.

19. In addition to having, both verbally and in writing, opposed the discrimination committed against her by the Defendants, Dennis has often, frequently, and very publicly opposed discrimination against any protected party, both inside and outside of government. Defendants refuse to recognize that discrimination in any form exists in Rochester, hoping not to sully in any way the City's reputation in the age of Destination Medical Center or Mayo Clinic's recent announced exponential growth plan.

20. Defendants, their employees and agents, have maliciously, intentionally, and frequently furnished false information about Dennis to the

13

Rochester's local newspaper the Post-Bulletin and other local and statewide media outlets sympathetic to City government. For example, Norton, in a brazen attempt to defame and injure Dennis, as well as to destroy her chances for re-election, told the lawyer from the City's captive law firm that Dennis as abusing her power by trying to "fix parking tickets," a statement that was subsequently published in the Rochester Post-Bulletin distributed in print and on-line on or about the 30th of June 2023. Norton knew this denigrating statement was false or made it without knowledge of its truth or falsity.

21. As a direct result of Defendants' illegal and tortious conduct, Dennis has and continues to endure mental anguish, and suffering as well as other extensive damages. The denigrating actions and orders of the defendant have adversely impacted Dennis' ability to perform her current job now and into the future.

### COUNT I.

22. Dennis re-alleges Paragraphs 1 – 21 in the within COUNT.

23. Defendants, and each of them, have violated the provisions of the Americans With Disabilities Act ("ADA"), 42 U.S.C. Sec. 12101, *et seq.*, by intentionally discriminating against Dennis on account of her disability, all to her damages.

## COUNT II.

24. Dennis re-alleges COUNT I in the within COUNT.

25. Defendants, and each of them, have violated the provisions of Minn. Stat. Sec. 363A.08 by intentionally discriminating against Dennis on account of her disability, all to Dennis's damages.

## COUNT III.

26. Dennis re-alleges COUNTS I – II in the within COUNT.

27. Defendants, and each of them, by preventing Dennis from carrying out the duties of the office to which she was elected which prevents her from fully accessing public services, have violated the provisions of Minn. Stat. Sec. 363A.12, all to Dennis's damages.

## COUNT IV.

28. Dennis re-alleges COUNTS I – III in the within COUNT.

29. Defendants, and each of them, by intentionally and without justification retaliating against Dennis because she has opposed discrimination, both of herself and others, have violated the provisions of Minn. Stat. Sec. 363A.15, all to Dennis's damages.

## COUNT V.

30. Dennis re-alleges COUNTS I – IV in the within COUNT.

31. Defendants, and each of them, by refusing to provide reasonable accommodation for Dennis's known disability, have violated Minn. Stat. Sec. 363.09, Subd. 6.

## COUNT VI.

32. Dennis re-alleges COUNTS I – V in the within COUNT.

33. Defendants, and each of them, have for the reasons noted above, violated the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, *et seq.*, as amended, the Civil Rights Act of 1991, the Lily Ledbetter Fair Pay Act of 2009, and 42 U.S.C. 1981, all to Dennis's damages.

## COUNT VII.

34. Dennis re-alleges COUNTS I – VI in the within COUNT.

35. Norton's published statement that Dennis tried to "fix parking tickets" was, as noted above, knowingly false when published or made without knowledge of its truth or falsity.

36. Norton's published statement about Dennis's fixing a ticket is an allegation that Dennis committed a criminal act under Minn. Stat. Sec.

609.43. As such, Dennis is entitled to recover damages from Norton without proof of special damages.

37. As a direct result of Norton's defamatory statement, made with actual malice, Dennis has been and continues to be damaged.

38. Because of Norton's deliberate disregard for her rights and safety, Dennis is entitled to move at the appropriate time to amend her Complaint to assert a claim of punitive damages against Norton pursuant to Minn. Stat. Secs. 549.191 and 549.20

## COUNT VIII.

39. Dennis re-alleges COUNTS I – VII in the within COUNT.

40. By their actions as noted above, Defendants, and each of them, together with their employees and agents, by, *inter alia*, demoting Dennis to employee status without due process, have violated Minn. Stat. Secs. 205.07, 412.191, and Articles 1 and 8 of the Minnesota Constitution, all to Dennis's damages.

## COUNT IX.

41. Dennis re-alleges COUNTS I – VIII in the within COUNT.

42. Norton and Keane are government officials.

43. Norton and Keane violated Dennis's First Amendment rights in their individual and official capacities.

44. At all times relevant herein, Dennis has engaged in constitutionally protected activities during City Council meetings, with city staff, and others.

45. By improperly and illegally censuring Dennis, Norton and Keane retaliated against her for engaging in constitutionally protected activities.

46. Norton and Keane have, by their conduct, intended to chill Dennis's will to participate in City Council meetings and/or criticize them, other City Council members, or City staff.

47. Norton and Keane would not have retaliated against Dennis if she had not freely spoken at City Council meetings and/or verbally criticized City Council members and unelected Rochester staff, including Zelms and Spindler-Krage.

48. The actions of Norton and Keane did, in fact, chill Dennis from continuing to engage in constitutionally protected activities that included speaking out at Council Meetings and elsewhere about many issues, including the City's blatant discrimination against her on account of her disability.

49. At all times relevant herein, Norton and Keane have acted under the color of law to curb Dennis's exercise of her First Amendment rights.

50. The actions of Norton and Keane were and continue to be willful, malicious, and in violation of the known constitutionally protected rights of Dennis.

51. Alternatively, Norton and Keane have acted with reckless and deliberate indifference to the constitutionally protected rights of Dennis.

52. The conduct of Norton and Keane subjects them to punitive damages as a matter of federal common law.

53. By their actions, Norton and Keane have in numerous respects violated the provisions of 42 U.S.C. Sec. 1983, all to Dennis's damages.

WHEREFORE, Dennis demands judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount in excess of $50,000 on each COUNT herein;

2. For injunctive relief under the state and federal laws cited above as the court deems appropriate.

3. For costs of investigation and attorney fees under 29 U.S.C. Sec. 2617, Minn. Stat. Sec. 363.14, 42 U.S.C. 1981a, and 42 U.S.C. Sec. 1988:

4. For pre-verdict interest as permitted by Minn. Stat. Sec. 549.09 and federal law;

5.  For her costs and disbursements incurred herein; and,

6.  For such other and further relief as the court may deem just and equitable. Thank you.

DATE: 7 March 2024

Molly Dennis
*Pro se*
412 26th Street NW
Rochester, MN. 55901
507-269-2916
mollydennis13@gmail.com