"

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Molly L. Dennis,                          **SECOND AMENDED COMPLAINT**

          Plaintiff,                   Case No:   24-CV-00426 (PJS/DLM)

v.

City of Rochester, Kim Norton, in her individual
as well as official capacity as the mayor of the
City of Rochester, and Patrick Keane, in his
individual as well as official capacity as a
City or Rochester Council Member,

          Defendants.

---

## FACTS

**As and for the Second Amended Complaint in this matter the undersigned counsel of record for the Plaintiffs, Paul T. Ostrów, Ostrow Law LLC, 2239 Arthur Street NE, Minneapolis, Minnesota 55418, and John Hayden, Attorney at Law, 6800 France Avenue South, Suite 405, Minneapolis, Minnesota 55435, hereby allege the following on behalf of Plaintiff Molly L. Dennis.**

1.      At all times relevant herein, Dennis was a member of the Rochester City Council ("City Council") and, in that capacity, was an employee within the meaning of state and federal statutes because the Defendants, and each of them, as well as the unelected employees and

1

agents of Defendant City of Rochester ("the City"), treated her as an

employee and not as an elected public official.

2.      At all times relevant herein, Defendant Kim Norton ("Norton")

was the Mayor of the City of Rochester.

3.      At all times relevant herein, Defendant Patrick Keane (Keane")

was an elected member of the Rochester City Council.

4.      The City treats its City Council members as employees by

regarding them as full-time employees with wages equal to or similar to

those of non-elected City employees, with an annual salary of over $54,000

Councilmembers earn similar wages to many government employees. Other

elected public servants agree. In a recent Chamber of Commerce training on

22 February 2024, for example, a current Olmsted County Commissioner

stated that Rochester City Council members' "*pay and work is equivalent to

a full-time employee*."

5.      City Council members perform intentional and beneficial work

for the City the same as unelected city staff are paid to perform. In essence,

they accomplish tasks that are identical or similar to the City's unelected

department employee positions (*e.g.,* answering city emails and questions of

citizens, taking phone calls to give information to residents, researching issues in all departments, advertising for the City on social media, etc.).

6.    Dennis's work on the City Council is equivalent or similar to the tasks performed by other unelected department employees who have the same functions. She goes door-to-door for public engagement, dispensing city department information, and initiates listening sessions in conjunction with City staff, such as for traffic calming measures, these tasks are similar to many other City staff. In addition, Dennis meets with City staff in the community to inform the public of various important issues (like installing or repairing playground equipment, road changes, crosswalks, taking photos of potholes to report to departments, etc.).  Dennis works on an equal basis with unelected City staff, exploring ideas for improvements and following their advice. Like other unelected City staff, Dennis is issued a City laptop, City parking decal, official City nametag, City insignia business cards, and an official government City badge/keycard which can access city buildings and areas similar to other City employees. She can use the "staff only" breakroom and restrooms, uses employee forms which label her an "employee", can purchase City logo apparel, gets City discounts, and can access restricted areas such the County building and City Hall after hours for work, has access to the mailroom and other governmental areas accessible

by unelected City staff. Dennis can reserve City conference rooms, schedule work meetings with unelected City colleagues, and has an office located in City Hall, similar to many other unelected City team members.

7.     Dennis attends legislative functions, informational meetings, team-building training, and represents the City in indoor and outdoor community booths the same as other unelected City employees. She also attends committee meetings, being the spokesperson for City updates and reports back to City Council and staff just as unelected City staff are paid to do.

8.     Dennis is meant to attend planned City Council meetings that are scheduled and have an agenda planned by the City Administrator, like other unelected City staff. Dennis cannot change the times or locations of these meetings in the same way unelected City staff do not have the ability. Similar to unelected City employees, failure to attend these required meetings could result in the loss of her position.

9.     The Internal Revenue Service (IRS) considers Dennis equal to that of unelected City employees, and she is taxed in the same way. In addition to a full-time wage, Dennis receives paid health benefits like full health insurance, dental, and vision coverage just like other unelected full-time City employees. Dennis also receives life insurance, disability

insurance, and retirement benefits through the as do other non-elected full-time City staff. This includes Public Employee Retirement Association (PERA) benefits similar to other unelected public governmental employees.

10.     There is not a separate Human Resources for Dennis or other elected officials, and they are treated no differently by the City's Human Resources (HR) Department with respect to their claims for harassment, discrimination and other employee-related personnel issues. Within the City's HR department, Dennis has a file titled "*Employee*" just like every other unelected City employee and uses official employee forms for instances such as travel reimbursement, signing her name under *employee.* Dennis has also used the Employee Assistance Program (EPA), the same as all city employees have access to and her paychecks have an employee number. Dennis was instructed she needs to abide by the same employee policy manual located within the HR online employee network: "Rochester @ work" as other unelected City employees must follow (e.g., technology usage, City organizational policies, and code of employee conduct (e.g., addressing conflicts of interest, disclosure information, and gifts etc.).

11.     Dennis was disciplined at work by unelected City staff, similar to the reprimand process and subjected to an employee performance evaluation, similar to that of other unelected City staff. One such employee

5

evaluation occurred on or about 20 June 2022 where Dennis was

reprimanded by City Administrator Alison Zelms ("Zelms") and City

Attorney Michael Spindler-Krage ("Spindler-Krage") who issued an official

written disciplinary list of steps. Dennis was reprimanded for symptoms of

her disability and in the same fashion the City Administrator would

reprimand her own subordinate unelected City employees. Zelms followed

the employee manual's Organizational Policy Disciplinary Action (page 3)

starting with progressive disciplinary steps: "A. Documented Verbal

Warning" which was done in front of witnesses followed by "B. Written

Reprimand" in an official document just as Zelms would do with her

unelected City staff. Later other steps of the employee manual were

followed similar to suspension (probation) through a harshly restrictive

censure which was intended to even further demote Dennis from her elected

status to City employee.  Spindler-Krage and Zelms also followed the

employee manual (page 4) when they cherry-picked a City-funded

investigator, whose law firm advertised at annual League of MN City

(LMC) conferences as defending government agencies against employee

lawsuits. This City hired defense attorney also followed the employee

manual by meeting with Dennis for the "purpose of gathering information

for an investigation" that would support the City's recent disciplinary

actions. The City funded investigators report, submitted on or about the 9th of June 2023, chose to interview only two staff Spindler-Krage and Zelms and its findings contained unfounded information that was nearly all subjective, misleading, or provably false. Comparing the report to the interview audio recording alone proves that information in the report is not accurate. Not only was the investigation funded by the Defendants, however, by assessing and sharing Dennis' individual data, such as her ADA medical information from her HR employee file, continued to follow the protocol of reprimanding as an unelected City's employee.

12.    At all times relevant herein, Dennis suffered from Attention Deficit Hyperactivity Disorder ("ADHD"), a recognized disability under state and federal law. Dennis openly disclosed her disability prior to starting her position on or about the 1st of January 2021. Soon after taking office Dennis filed her official medical ADA accommodation letter which was authored by medical staff at Mayo Clinic. Even with an official list of reasonable accommodation, the City failed to provide basic accommodation, such as the reasonable request for an hourly break. Instead of accommodating Dennis, the Defendants punished her for having a disability and made it harder for Dennis to perform the basic functions of her job (e.g., limiting verbal in-person communication, preventing Dennis from meeting

with essential City staff, and restricting access to once easily accessible information/resources)

13.    The Defendants, together with their employees and agents, have intentionally discriminated against Dennis on account of her disability by, *inter alia*, reprimanding and punishing her for symptoms of her federally protected disability. Symptoms discriminated against such as difficulty focusing, short attention span, struggle with linear processing and working memory, executive functioning deficit, fidgeting and wide hand gestures, time "blindness," impulsivity, hyperactivity, and other well-known characteristics of ADHD. A severe criticism of Dennis by the Defendants is that "*she wastes staff time*" example given was Dennis asks too many questions. The requirement of needing additional time for processing, explaining, and clarifying information is a common consequence of people diagnosing with a learning disability. Neurodevelopmental processing disabilities, such as ADHD or Autism, often require additional information and explanation for understanding, Dennis was punished for asking questions needed to do her job.

14.    On or about 6 March 2023, the Defendants censured Dennis for her actions and behaviors that were directly caused by and related to her ADHD disability as noted above. The March 6th censure with unfounded

claims and subjective language was approved by City staff and brought to
City Council by Keane in a public ambush to shame and chastise Dennis.
The harshly restrictive censure was presented without warning, published in
the Council packet or any knowledge citizens or Dennis this was going to
occur. Not only did this unprecedently harsh and restrictive censure
blindside Dennis, but it was also issued without required public notification
and without following due process. This clearly improper and probably
illegal censure imposed severe restrictions that had the intended
consequence of silencing, controlling, and further demoting Dennis to
employee status. In addition, the March 6th censure has prevented Dennis
from carrying out her constitutional and statutory duties as an elected public
official. For example, Dennis, unlike any other council members, was
prohibited from directly asking questions to over 900 City staff members.
According to the March 6 censure, Dennis was not allowed to talk to any
City staff, except a dozen or so Department heads, restricting the discussion
of any city issue for over nine months. The censure also implied Dennis
could not criticize the government or policy in Council meetings as the
censure forbids "negative interactions" with Council or City staff. When
asked, she was informed by Spindler-Krage that the constitutional right to
free speech did not apply to her when she was being punished. This gag-

order censure did not allowed Dennis to talk about anything City related topic with nearly a thousand City employees (e.g., on the phone or in person with any librarians, park staff, City bus drivers, police officers, firefighters, public utilities, community development, public works, front desk staff in any city building including City Hall, etc.)  Dennis had to leave community events, avoid locations, excuse herself from neighborhood discussions with residents in her ward when discovering a resident was a city employee. Obtaining accurate and timely information is a critical function of any elected official, normally done by all councilmembers, to understand complex city issues and respond to concerns from constituents. Historically when an elected official is censured, it is a verbal reprimand of disapproval, this March 6th censure however had outrageous and disproportionate restrictions which hindered her ability to do her job at work as well as function in her personal life. Based on the symptoms of Dennis's protected disability she was harshly censured and punished.

15.    Zelms, Spindler-Krage, and Norton, in retaliation to Dennis speaking up against the discriminating censure, all refused to continue to meet with Dennis. Zelms stated in writing that Dennis was even blocked from all communication with her. All three individuals above continued to ostracize Dennis from important conversations and dismissed her City

questions without answering (e.g., rejected requests for basic City budget data, background information on City issues/policies, resident inquiries etc.). If Dennis received a question from a citizen, for example an inquiry concerning city legal matters, Dennis was ordered to follow a strict regimen to get the answer. Ordered in writing by the City Attorney, Dennis was required to hand-write/type the question on a sheet of paper, she must place the paper in an envelope, travel to the Government Center downtown, and place the envelope into Spindler-Krage's City Hall mailbox. If these steps were not followed the City Attorney would not respond to the question Dennis asked. These detailed instructions were sent solely to Councilmember Dennis; no other Council members were required to jump through such cumbersome and demeaning hoops for the basic requirements for their job.

16.    Another example is when Zelms sent Dennis an official government email on the 26th of December 2023, just days before the censure was to expire. The Dec 26th email was address to only Dennis but forward to the entire City Council, Norton, and numerous City leadership staff containing new stringent rules that would place even further restriction on how Dennis would be allowed to communicate with City staff in 2024 and beyond. Without approval from the City Council, the highest-ranking

City staff, the City Administrator added more controls to Dennis's freedom of speech, limiting access to needed information, and restraining essential job functions indefinitely. The March 6th censure ended on Dec 31, 2023, however unelected City staff were now still instructed to continue to punish and restrict Dennis. Zelms has restricted Dennis communication and activities for year and continues to treat and reprimand Dennis as if she was another City employee. Zelms' Dec 26 email controlled what topics Dennis is allowed to discuss, the lengths of staff interaction, and means by which Dennis is allowed for meetings. Zelms was made aware that Dennis processes information most effectively verbally and intentionally restrict the way Dennis was able to obtain information due to her disability with the email stating, *"The meetings will occur virtually unless the designee or I approve an exception.*" These controlling, undermining, and retaliatory restrictions further demoted Dennis to the equivalent of Zelms subordinate unelected City staff.

17. Even though both Spindler-Krage and Zelms are unelected City staff, they retain, by requiring this convoluted and humiliating process and harsh regulations, sole authority over whether Dennis can ask a question of other City employees, what topics/policies are permitted to get information on. In this way, as well as <u>many</u> others, employees and agents of

the City of Rochester have exercised and continue to exercise direct control over an elected city official, in effect negating the votes of the persons who voted for Dennis in the most recent city election.

18.    Dennis has frequently and repeatedly complained to Defendants, as well as their employees and agents, about their intentional discrimination against her on account of her disability. None of Dennis' complaints have resulted in any retraction of discriminating behavior against Dennis or remedial action to accommodate Dennis's disability. The action Defendants have instead taken is to have hired a captive law firm to whitewash their discriminatory actions and the Defendants' own bad behavior. And, as a result of said complaints, the Defendants have repeatedly engaged in reprisals and retaliation against Dennis making it virtually impossible for her to discharge her duties as an elected public official. In one unusual and highly reprehensible form of retaliation, Spindler-Krage saw to it that unverified and defamatory averments made by Dennis's ex-spouse in a dissolution proceeding were widely published as though they were true.

19.    In addition to having, both verbally and in writing, opposed the discrimination committed against her by the Defendants, Dennis has often, frequently, and very publicly opposed discrimination against any protected

party, both inside and outside of government. Defendants refuse to recognize that discrimination in any form exists in Rochester, hoping not to sully in any way the City's reputation in the age of Destination Medical Center or Mayo Clinic's recently announced exponential growth plan.

20. Defendants, their employees and agents, have maliciously, intentionally, and frequently furnished false information about Dennis to Rochester's local newspaper the Post-Bulletin and other local and statewide media outlets sympathetic to City government. For example, Norton, in a brazen attempt to defame and injure Dennis, as well as to destroy her chances for re-election, told the lawyer from the City's captive law firm that Dennis as abusing her power by trying to "fix parking   tickets," a statement that was subsequently published in the Rochester Post-Bulletin distributed in print and on-line on or about the 30th of June 2023. Norton knew this denigrating statement was false or made without knowledge of its truth or falsity.

21. As a direct result of Defendants' illegal and tortious conduct, Dennis has and continues to endure mental anguish and suffering as well as other extensive damages. The denigrating actions and orders of the defendant have adversely impacted Dennis' ability to perform her current job now and into the future.

22. **The Code of Ethics and Conduct for Elected and Appointed Officials includes "Conduct Guidelines" that seek to restrain the speech and conduct of Council Members by prohibiting behavior deemed by the majority of Council Members as violating decorum, a failure to compromise, disparagement of other Council Members, making unwanted gestures, and other behaviors.**

23. **Section 5.06 of the Code provides that a majority of Council Members may "punish their members for cause."**

24. **The Code of Ethics and Conduct for Appointed Officials provides that Council Members are subject to sanctions for violating the Code, including forfeiture of committee assignments or "other privileges afforded by the Council."**

25. **The Code of Ethics and Conduct's plain meaning and application are unconstitutionally overbroad and vague, chilling protected speech and arbitrarily targeting Plaintiff's exercise of her First Amendment rights.**

26. **Plaintiff exercised her constitutional rights and the constitutional rights of her constituents by engaging in protected speech, including:**

a. **Objecting to violations by the Mayor, City Council Members, and City staff of state law prohibiting the use of frequent flyer miles and discounts accrued on city-funded travel for personal use.**

b. **Objecting to the use of the Plummer House and the absence of a live recording of the strategic planning meeting held on February 27, 2023, as a violation of the City of Rochester's established policies related to transparency.**

c. **Requesting reasonable accommodation for her ADHD, including breaks in Council proceedings and training for Council Members and staff relating to her disability, to enable effective participation.**

d. **Disagreeing with majority positions of the Council on issues, even if her behavior was deemed "annoying" by one or more Council Members, as part of her duty to represent diverse constituent views.**

e. **Conducting her public duties in a manner consistent with her ADHD, including displaying hyperactivity, short attention span, requiring additional time to process information, and verbal processing of information.**

27. In response to Plaintiff's protected speech, Defendants City of

Rochester, Patrick Keane, and Kim Norton engaged in concrete

adverse actions, only some of which were sanctions and

punishments adopted contemporaneously with the March 6, 2023

censure, to retaliate against Plaintiff and chill her First

Amendment rights. These actions include:

a. Communication Restrictions: Defendants prohibited

Plaintiff from attending staff meetings other than with

department heads, banned direct conversations with over

nine hundred City employees, and restricted her to virtual

meetings with department heads unless exceptions were

approved. These restrictions, not imposed on other Council

members, severely limited Plaintiff's ability to gather

information essential to her role.

b. Banishment from City Council Meetings: On several

occasions during Plaintiff's service on the City Council

Plaintiff was evicted from City Council meetings during the

proceedings. The plaintiff was also threatened with a ban on

attendance at City Council meetings.

c. **Exclusion from Council Interactions: Mayor Norton and Councilmember Keane refused to interact with Plaintiff on Council matters, ostracized her from critical discussions, and dismissed her questions without answers, actions extending beyond the censure as part of a broader retaliatory pattern.**

d. **Arbitrary Procedural Barriers: Defendants adopted a policy of refusing to second any Council-initiated action motioned by Plaintiff and frequently interrupted or refused to recognize her during Council debates, constructively limiting her ability to speak and advocate.**

e. **Enforcement of Vague, Overbroad and Arbitrary Rules: The September 13, 2024, Memorandum from City Clerk Kelly K. Geistler and City Attorney Michael Spindler-Krage, attached as Exhibit A to the Second Amended Complaint, clarified the Code's prohibition of "derogatory remarks" and "insinuations" (e.g., "rubber stamping," "destroying democracy," "conflict of interest," "abuse of power"), which were arbitrarily enforced against Plaintiff to target her criticism of city governance. The**

Memorandum's admonition against such terms, deemed

violations based on "cumulative impact" and Council

discretion, was applied to silence Plaintiff's protected

speech.

28. The Code of Ethics and Conduct, as applied through September

13, 2024, Memorandum, operates as a prior restraint by imposing

vague and overbroad restrictions that preclude Plaintiff from

fulfilling her core responsibilities as an elected official. These

responsibilities include:

a.  Acting as a check on municipal governance by scrutinizing

and publicly addressing potential misconduct or corruption,

such as misuse of public resources (e.g., frequent flyer

miles) or lack of transparency (e.g., unrecorded meetings).

b.  Advocating for constituents by raising concerns about

unethical behavior, including conflicts of interest or abuses

of power by the Mayor, Council members, or staff.

c.  Ensuring accountability by criticizing policies or actions

that undermine public interest, such as "rubber stamping"

decisions without adequate debate.

29. **The Code's vague and overbroad prohibitions (e.g., banning "derogatory remarks" like "abuse of power" or "conflict of interest") and threat of sanctions, such as loss of committee assignments or privileges, force Plaintiff to either remain silent on potential misconduct or risk punishment, effectively rendering her complicit in unethical or potentially corrupt practices. This restraint undermines her constitutional duty to represent her constituents and maintain public trust in governance.**

30. **The adverse actions and prior restraint caused Plaintiff mental anguish, reputational harm, and significantly impaired her ability to represent her constituents, violating her First Amendment rights and her constituents' rights to effective representation.**

## COUNT I.

22.     Dennis re-alleges Paragraphs 1 – 21 in the within COUNT.

23.  Defendants, and each of them, have violated the provisions of the Americans With Disabilities Act ("ADA"), 42 U.S.C. Sec. 12101, *et seq*., by intentionally discriminating against Dennis on account of her disability, all to her damages.

## COUNT II.

20

24.    Dennis re-alleges COUNT I in the within COUNT.

25.    Defendants, and each of them, have violated the provisions of Minn. Stat. Sec. 363A.08 by intentionally discriminating against Dennis on account of her disability, all to Dennis's damages.

## COUNT III.

26.    Dennis re-alleges COUNTS I – II in the within COUNT.

27.    Defendants, and each of them, by preventing Dennis from carrying out the duties of the office to which she was elected which prevents her from fully accessing public services, have violated the provisions of Minn. Stat. Sec. 363A.12, all to Dennis's damages.

## COUNT IV.

28.    Dennis re-alleges COUNTS I – III in the within COUNT.

29.    Defendants, and each of them, by intentionally and without justification retaliating against Dennis because she has opposed discrimination, both herself and others, have violated the provisions of Minn. Stat. Sec. 363A.15, all to Dennis's damages.

## COUNT V.

30.    Dennis re-alleges COUNTS I – IV in the within COUNT.

31.    Defendants, and each of them, by refusing to provide reasonable accommodation for Dennis's known disability, have violated Minn. Stat. Sec. 363.09, Subd. 6.

## COUNT VI.

32.    Dennis re-alleges COUNTS I – V in the within COUNT.

33.    Defendants, and each of them, have  for the reasons noted above, violated the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, *et seq*., as amended, the Civil Rights Act of 1991, the Lily Ledbetter Fair Pay Act of 2009, and 42 U.S.C. 1981, all to Dennis's damages.

## COUNT VII.

34.    Dennis re-alleges COUNTS I – VI in the within COUNT.

35.    Norton's published statement that Dennis tried to "fix parking tickets" was, as noted above, knowingly false when published or made without knowledge of its truth or falsity.

36.    Norton's published statement about Dennis's fixing a ticket is an allegation that Dennis committed a criminal act under Minn. Stat. Sec. 609.43.  As such, Dennis is entitled to recover damages from Norton without proof of special damages.

37.    As a direct result of Norton's defamatory statement, made with actual malice, Dennis has been and continues to be damaged.

38.    Because of Norton's deliberate disregard for her rights and safety, Dennis is entitled to move at the appropriate time to amend her Complaint to assert a claim of punitive damages against Norton pursuant to Minn. Stat. Secs. 549.191 and 549.20

## COUNT VIII.

39.    Dennis re-alleges COUNTS I – VII in the within COUNT.

40.    By their actions as noted above, Defendants, and each of them, together with their employees and agents, by, *inter alia*, demoting Dennis to employee status without due process, have violated Minn. Stat. Secs. 205.07, 412.191, and Articles 1 and 8 of the Minnesota Constitution, all to Dennis's damages.

## COUNT IX.

41.    Dennis re-alleges COUNTS I – VIII in the within COUNT.

42.    Norton and Keane are government officials.

43.    Norton and Keane violated Dennis's First Amendment rights in their individual and official capacities.

44.    At all times relevant herein, Dennis has engaged in constitutionally protected activities during City Council meetings, with city staff, and others.

45.    By improperly and illegally censuring Dennis, Norton and Keane retaliated against her for engaging in constitutionally protected activities.

46.    Norton and Keane have, by their conduct, intended to chill Dennis's will to participate in City Council meetings and/or criticize them, other City Council members, or City staff.

47.    Norton and Keane would not have retaliated against Dennis if she had not freely spoken at City Council meetings and/or verbally criticized City Council members and unelected Rochester staff, including Zelms and Spindler-Krage.

48.    The actions of Norton and Keane did, in fact, chill Dennis from continuing to engage in constitutionally protected activities that included speaking out at Council Meetings and elsewhere about many issues, including the City's blatant discrimination against her on account of her disability.

49.    At all times relevant herein, Norton and Keane have acted under the color of law to curb Dennis's exercise of her First Amendment rights.

50.    The actions of Norton and Keane were and continue to be willful, malicious, and in violation of the known constitutionally protected rights of Dennis.

51.    Alternatively, Norton and Keane have acted with reckless and deliberate indifference to the constitutionally protected rights of Dennis.

52.    The conduct of Norton and Keane subjects them to punitive damages as a matter of federal common law.

## COUNT X: FIRST AMENDMENT RETALIATION (ADMINISTRATIVE SANCTIONS)

53. **Plaintiff re-alleges and incorporates Paragraphs 1-52.**

   a) **Objecting to illegal use of frequent flyer miles and discounts by city officials.**

   b) **Opposing the use of the Plummer House and lack of transparency in the February 27, 2023 strategic planning meeting.**

   c) **Requesting reasonable accommodation for her ADHD to enable effective participation in Council proceedings.**

   d) **Disagreeing with majority Council positions and performing her duties in a manner consistent with her ADHD.**

54. **Defendants City of Rochester, Patrick Keane, and Kim Norton took concrete adverse actions against Plaintiff in retaliation for her protected speech, including:**

a. Prohibiting Plaintiff from direct communication with City staff, limiting her to virtual meetings with department heads, and requiring written submissions through the City Attorney, restrictions not imposed on other Council members.

b. Excluding Plaintiff from critical Council discussions and refusing to engage with her questions or motions.

c. Adopting a policy of refusing to second Plaintiff's motions and interrupting or refusing to recognize her during debates.

d. Arbitrarily enforcing the Code of Ethics and Conduct's vague and overbroad prohibitions, as clarified in the September 13, 2024, Memorandum, to target Plaintiff's critical speech.

55. These adverse actions were administrative and procedural actions to be distinguished from the censure as set forth in Count IX, which the Court deemed a legislative act immune from suit. They include non-legislative, administrative, and procedural measures that materially harmed Plaintiff's ability to perform her duties and represent her constituents.

56. The Court previously found that exclusions from relevant workplace communications by Plaintiff was a plausible allegation of an adverse action ADA disability-related retaliation. The Plaintiff alleges that exclusions outlined above similarly constitute an adverse action relative to her claim for First Amendment retaliation.

57. The impact of the adverse actions taken against the Plaintiff resulted in significantly greater harm to Plaintiff than would otherwise have been the case due to her disability.

58. A causal connection exists between Plaintiff's protected speech and the adverse actions, evidenced by the temporal proximity between her objections (e.g., February 27, 2023, meeting and ongoing accommodation requests) and the imposition of restrictions, exclusions, and rule enforcement (e.g., March 6, 2023, censure-related restrictions and September 13, 2024 Memorandum).

59. These actions chilled Plaintiff's First Amendment rights and would deter a person of ordinary firmness from engaging in protected speech.

60. Defendants' actions violated Plaintiff's First Amendment rights, causing damages including mental anguish, reputational harm, and impaired ability to serve her constituents.

### COUNT XI: FIRST AMENDMENT PRIOR RESTRAINT

61. Plaintiff re-alleges and incorporates Paragraphs 1-60.

62. The City of Rochester's Code of Ethics and Conduct for Elected and Appointed Officials, as applied through the September 13, 2024, Memorandum from City Clerk Kelly K. Geistler and City Attorney Michael Spindler-Krage, constituted an unconstitutional prior restraint on Plaintiff's First Amendment rights by imposing vague and overbroad restrictions that precluded her from fulfilling her core responsibilities as an elected official.

63. The Code as applied in the Memorandum prohibited "derogatory remarks" and "insinuations," such as "rubber stamping," "destroying democracy," "conflict of interest," or "abuse of power," without clear definitions, allowing the Council majority to arbitrarily deem Plaintiff's speech as violating decorum.

64. The Code authorized sanctions, including forfeiture of committee assignments or other privileges, for speech deemed unacceptable by the Council, which functioned as the "final arbiter" of violations. This vague and discretionary enforcement chilled Plaintiff's ability to:

    a. Scrutinize city governance for potential misconduct or corruption, such as misuse of public resources (e.g., frequent flyer miles) or lack of transparency (e.g., unrecorded meetings).

    b. Advocate for constituents by raising concerns about unethical behavior, including conflicts of interest or abuses of power by the Mayor, Council members, or staff.

    c. Ensure accountability by criticizing policies or actions that undermine public interest, such as "rubber stamping" decisions without adequate debate.

65. By prohibiting Plaintiff from using terms like "conflict of interest" or "abuse of power" without objective standards, the Code forces Plaintiff

into complicity with potentially corrupt or unethical practices. Silence on such matters, compelled by the threat of sanctions, prevents Plaintiff from fulfilling her constitutional duty to act as a check on municipal governance and represent her constituents' interests in transparent and accountable government.

66. The Code's vague and overbroad prohibitions, coupled with the Council's unbridled discretion to enforce them, constitute a prior restraint that chills Plaintiff's protected speech and deters her from performing her essential duties.

67. This prior restraint severely impaired Plaintiff's ability to advocate for her constituents, risk rendering her complicit in unchecked misconduct, and caused damages, including mental anguish, reputational harm, and diminished effectiveness as a Council member.

68. By their actions, Norton and Keane have in numerous respects

violated the provisions of 42 U.S.C. Sec. 1983, all to Dennis's damages.

WHEREFORE, Dennis demands judgment against Defendants, and each of them, as follows:

1. For compensatory damages in an amount more than $50,000 on each COUNT herein.

2. For injunctive relief under the state and federal laws cited above as the court deems appropriate.

3. For costs of investigation and attorney fees under 29 U.S.C. Sec. 2617, Minn. Stat. Sec. 363.14, 42 U.S.C. 1981a, and 42 U.S.C. Sec. 1988:

4. For pre-verdict interest as permitted by Minn. Stat. Sec. 549.09
and   federal law.

5. For her costs and disbursements incurred herein; and,

6. For such other and further relief as the court may deem just and equitable. Thank you.

DATE: June 30, 2025

/s/ Paul T. Ostrow                                    /
Attorney Identification No. 151889
Ostrow Law LLC
Minneapolis, Minnesota 55418

/s/ John Hayden
Attorney Identification No.
6800 France Avenue South Suite 405
Minneapolis, Minnesota 55435