UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MOLLY L. DENNIS,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>CITY OF ROCHESTER; PATRICK KEANE, in his individual as well as official capacity as a City of Rochester council member; and KIM NORTON, in her individual as well as official capacity as the mayor of the City of Rochester,<br><br>　　　　　　　　Defendants. | CASE NO.: 24-CV-0426 (PJS/DLM)<br><br>PLAINTIFF'S COMBINED REPLY IN SUPPORT OF MOTION TO AMEND AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO AMEND COMPLAINT |

**INTRODUCTION**

Plaintiff Molly Dennis respectfully submits this combined Reply and Memorandum of Law in Support of her Motion to Amend the Complaint. Pursuant to the Court's Pretrial Scheduling Order, Plaintiff is entitled to file a Reply where, as here, Defendants oppose amendment on the grounds of futility. *See* ECF No. 44 at 4.[1]

---

[1] Plaintiff acknowledges that the motion to amend, filed on July 1, 2025, was not accompanied by a memorandum of law as required by Local Rule 7.1(b)(1). This omission was the product of counsel's good-faith effort to comply with the Scheduling Order's July 1 deadline to bring motions to amend pleadings. In focusing on that hard deadline, Plaintiff's counsel inadvertently overlooked the Local Rule's 2012 revision, which clarified that supporting memoranda must be filed *simultaneously* with the motion - not 14 days before the hearing, as was previously permitted.

Plaintiff acted diligently. After a conversation with the Court's Clerk, it was decided that a comprehensive Reply brief could be the neatest solution, and Judge Micko can provide direction upon return from vacation.

Upon review of Defendants' Response and further research, Plaintiff agrees to drop the Prior Restraint claim, and requests declaratory relief to find the Rules and Memo unconstitutional as overbroad, vague, and impermissible content-based restraints

Previously, the Court dismissed Plaintiff's First Amendment claim because the operative complaint identified only the censure as the alleged adverse action, which the Court found to be a legislative act entitled to absolute immunity. See *Order Adopting R&R*, ECF No. 51 at 4 (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 54–56 (1998)). The proposed amended complaint, by contrast, alleges legislative conduct outside the sphere of legitimacy and non-legislative conduct - including individualized restrictions on speech, enforcement of unofficial "rules," and selective exclusion from city processes - that fall outside legislative immunity.

**RULES**

Federal Rule of Civil Procedure 15 governs amendments to pleadings. A party may amend its pleading once as a matter of course within a limited time. Thereafter, "a party may amend its pleading only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(1)–(2).

The Eighth Circuit has consistently emphasized the liberal standard for leave to amend: "Given the courts' liberal viewpoint towards leave to amend, it should normally be granted absent good reason for a denial." *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 943 (8th Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "[D]enial of leave to amend is appropriate only in those limited circumstances in which undue delay,

2

bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the non-moving party can be demonstrated." *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 995 (8th Cir. 2001) (citing *Foman*, 371 U.S. at 182). The burden of proving prejudice rests with the party opposing amendment. *Id.*

Here, Defendants oppose the amendment on grounds of futility. An amendment is "futile" if it "could not survive a motion to dismiss under Rule 12(b)(6)." *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010); see also *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987). Under the Rule 12(b)(6) standard, a complaint must plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); see *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). A claim is plausible where the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In assessing plausibility, courts accept the facts alleged as true and view them in the light most favorable to the plaintiff. *Thompson v. Harrie*, 59 F.4th 923, 926 (8th Cir. 2023); *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).

Lastly, under Local Rule 72.2(a)(3)(B), when a motion to amend is denied by a magistrate judge on grounds of futility and reviewed by the district court, the standard of review is de novo. See *Zutz*, 601 F.3d at 851.

## ARGUMENT

I. **THE SECOND AMENDED COMPLAINT ALLEGES A FIRST AMENDMENT RETALIATION CLAIM, SUPPORTED BY NON-LEGISLATIVE ADVERSE ACTIONS**

"As a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech. *Houston Community College System v. Wilson*, 595 U.S. 468, 474 (2022) (citing *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722, 204 L.Ed.2d 1 (2019)). To successfully plead a First Amendment retaliation claim, a plaintiff must show that: (1) the plaintiff engaged in some protected activity; (2) one or more government officials took some action that would chill a reasonable person from continuing in the activity; and (3) there is a causal connection between the protected activity and adverse action. *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014); *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

Defendants do not contend that Plaintiff engaged in protected free speech in their opposition. ECF #79 at 11, n2. The primary issue is whether Plaintiff alleges Defendants engaged in action that would chill a reasonable person from continuing in the activity, which is an analysis of the adverse actions taken against Plaintiff.

In *Houston Community College Sys. v. Wilson*, the Supreme Court reaffirmed that a purely verbal censure issued within a deliberative body is part of the rough-and-tumble of democratic discourse, not an actionable constitutional violation. 595 U.S. 468 (2022). But *Wilson* also left open a critical question: when, if ever, does a censure cross the constitutional line? When sanctions go beyond speech - when they materially burden an official's duties or chill protected expression - they may trigger First Amendment scrutiny.

4

This case presents precisely that scenario. Plaintiff does not challenge mere words of disapproval. She challenges a series of punitive measures that, while wrapped in the language of "censure," effectively silenced her voice, obstructed her legislative functions, and excluded her from participating in government. Under the evolving doctrine set forth in *Wilson*, clarified by *Boquist* and *Temple* (*infra*), and underscored by Justice Jackson's recent dissent in *Libby v. Fecteau*, such actions fall outside the shelter of legislative immunity and demand judicial review.

A. **Permissible Censures Under *Wilson***

In *Wilson*, the Supreme Court held that a purely verbal censure issued by a legislative body against one of its own members does not amount to a materially adverse action that could support a First Amendment retaliation claim under 42 U.S.C. § 1983. The censure in *Wilson* was understood to be nothing more than a form of speech - an expression of disapproval - issued by one elected official against another within the same deliberative body:

> The censure at issue before us was a form of speech by elected representatives concerning the public conduct of another elected representative. Everyone involved was an equal member of the same deliberative body. The censure did not prevent Mr. Wilson from doing his job, it did not deny him any privilege of office, and Mr. Wilson does not allege it was defamatory. Given the features of Mr. Wilson's case, the Board's censure does not qualify as a materially adverse action capable of deterring Mr. Wilson from exercising his own right to speak.

*Wilson*, 595 U.S. 468, 469 (2022).

Because it came from peers, concerned only public conduct, and did not impair the censured official's ability to do his job, the Court found that it fell within the bounds of protected political discourse. "As it comes to us, too, the censure did not prevent Mr. Wilson from doing his job, it did not deny him any privilege of office, and Mr. Wilson does not allege it was defamatory." *Id.* at 479.

The takeaway from *Wilson* is that a verbal censure issued by peers within a legislative body, so long as it does not include tangible penalties or materially chill speech, is not actionable under the First Amendment. The decision affirms that elected officials must tolerate criticism from one another as part of the democratic process and that such criticism, even when formally expressed, remains protected political speech.

**B.     When a Censure Becomes an Adverse Action**

Although the Supreme Court in *Wilson* held that a purely verbal censure among colleagues in a deliberative body did not rise to the level of a materially adverse action, the Court made clear that it was not reaching the question of censures that are accompanied by punitive consequences. Specifically, the Court noted that its opinion did not address "legislative censures accompanied by punishments," particularly those that deny privileges of office or impair an official's ability to carry out their responsibilities. *Wilson*, 595 U.S. at 480.

In that case, the Houston Community College System Board had imposed several additional restrictions on the plaintiff, including making him ineligible for officer positions and denying reimbursement for travel expenses. The Supreme Court declined to review those aspects of the case on procedural grounds, but it expressly acknowledged that

sanctions of that sort could raise First Amendment concerns. *Id*. at 474, 480. The Court's comments left no doubt that censures paired with tangible consequences - especially those that restrict the functioning of an elected official - could constitute adverse actions.

The Ninth Circuit's decision in *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022), offers a concrete example of this distinction. There, the Oregon State Senate imposed a rule requiring Senator Boquist to provide 12 hours' advance written notice before entering the Capitol. This rule was adopted in response to his public criticisms of majority party leadership. The Ninth Circuit concluded that the rule was a materially adverse action because it effectively hampered Boquist's ability to perform his duties as a legislator. It prevented him from engaging in impromptu debate, meeting with constituents, and participating fully in the legislative process. *Id*. at 783–84. Citing *Wilson*, the court emphasized that such restrictions on access and speech went beyond permissible verbal rebuke and imposed a significant burden on Boquist's First Amendment rights. *Id*. at 783–84.

Unlike the verbal censure upheld in *Wilson*, the punitive measure in *Boquist* carried real consequences that affected the official's ability to do his job. The Ninth Circuit also noted that such an access restriction was not rooted in any established legislative tradition, underscoring Wilson's warning that punitive sanctions imposed in response to protected speech may violate constitutional protections. *Id*. at 783.

C.  **Application of the *Wilson* and *Boquist* Framework in the Eighth Circuit for Assessing Punishments Beyond Verbal Censure**

In *Temple v. Lower Elkhorn Natural Resources District*, No. 4:23-CV-3198, 2023 WL 8934966 (D. Neb. Dec. 27, 2023), a district court within the Eighth Circuit applied the legal framework articulated in *Wilson* and *Boquist* to determine whether sanctions beyond a verbal censure amounted to materially adverse actions under the First Amendment. The court focused on whether the penalties departed from established legislative tradition and whether they impaired the official's ability to perform her duties - key considerations emphasized in both *Wilson* and *Boquist*.

In *Temple*, the Lower Elkhorn Natural Resources District (LENRD) sanctioned elected board member Melissa Temple after she spoke to the media about a complaint she had filed. The LENRD suspended her from all committee assignments for one year and revoked her ability to obtain reimbursement for out-of-district travel. *Temple*, 2023 WL 8934966, at *1. Applying *Wilson*, the court first examined whether these measures were supported by "long settled and established practice." While verbal censures enjoy deep historical roots in legislative bodies, the court found no comparable tradition supporting the suspension of statutory reimbursements as a legitimate disciplinary tool. *Id*. at *5. Because Nebraska law guarantees such reimbursements, and because Temple could not otherwise afford to attend essential functions such as conferences and workshops, the court found that this sanction materially interfered with her ability to serve her constituents. *Id*. at *5–6. This lack of historical support and the practical burden it imposed distinguished the measure from the purely verbal censure upheld in *Wilson*.

While the court deemed the suspension from committee work a lesser sanction due to its common occurrence in political contexts, it concluded that the travel reimbursement restriction independently crossed the threshold of material adversity. *Temple*, 2023 WL 8934966, at *5.

      **D.**      **The Intersection of Censure, Disability, and Adverse Action Under the ADA and First Amendment**

In assessing whether the City's actions were adverse, the Court should take into account Plaintiff's known disability and her formally submitted accommodation requests. While certain procedural restrictions - such as limiting direct communication with staff or requiring written submissions - may appear facially benign, their application to an elected official with ADHD who has expressly requested accommodations for verbal processing and timely, in-person communication imposes a materially different and disproportionate burden. When government officials impose barriers after being placed on notice of a disability, even otherwise permissible measures may rise to the level of an adverse action due to their specific impact.

This is no different than requiring, as part of a censure, an elected official who uses a wheelchair to attend a critical council meeting in an upstairs room while knowingly failing to ensure the elevator is functional. For able-bodied members, the requirement may be routine. But for the member who requires accommodation, it effectively denies access to the core functions of office. Here, by denying Dennis the ability to communicate in real time or interact directly with staff - methods essential to her effective service and protected

9

expression - the City's restrictions functionally impaired her participation in the legislative process, magnifying the chilling effect on her speech and duties.

### E. The Alleged Adverse Actions of the Amended Complaint Survive a Motion to Dismiss, and are not Futile

Under the framework articulated in *Wilson*, *Boquist*, and *Temple*, the proposed Second Amended Complaint pleads sufficient facts to establish that Plaintiff was subjected to materially adverse actions in retaliation for her protected speech. These allegations, taken as true and viewed in the light most favorable to the Plaintiff, demonstrate concrete impairments on her ability to fulfill the responsibilities of elected office and would chill a person of ordinary firmness from exercising their First Amendment rights.

Specifically, Plaintiff pleads that Defendants imposed the following adverse actions against her:

1. Communication restrictions that barred Plaintiff from directly interacting with over 900 City employees, required all communications to go through a limited number of department heads, and imposed virtual-only meetings without approval, thereby obstructing her access to information necessary to perform her duties (¶ 27(a));

2. Banishment from City Council meetings and threats of exclusion from official proceedings, effectively denying her participation in the core legislative functions of her office (¶ 27(b)); [2]

---

[2] The Court may take notice of such a removal here: https://www.youtube.com/live/bn9SDB2CZ8s?feature=shared&t=12104.

3. Exclusion from Council discussions, including coordinated refusals to respond to questions or engage in deliberations, which isolated her from the governance process (¶ 27(c));

4. Procedural barriers, such as a policy of refusing to second her motions and cutting her off during Council debate, which impaired her ability to participate meaningfully in meetings (¶ 27(d));

5. Enforcement of vague and overbroad rules, as clarified in the September 13, 2024, Memorandum, that prohibited terms such as "rubber stamping," "conflict of interest," "abuse of power," and "destroying democracy" - terms often used by Plaintiff to express her opposition to policies or practices she viewed as unethical or unlawful. These rules were enforced at the discretion of the Council majority and operated as a prior restraint, threatening Plaintiff with the loss of committee assignments and other privileges for expressing disfavored views (¶¶ 27(e), 28–29).

The chilling effect of these restrictions is evident. Plaintiff alleges that she was forced to remain silent or risk punishment for voicing concerns about misuse of public resources, lack of transparency, and other matters of public concern. She further pleads that these measures caused her reputational harm, mental anguish, and prevented her from representing her constituents effectively (¶ 30).

As *Wilson* made clear, while verbal censures among peers may be permissible, punitive measures that go beyond speech - especially those that impair an elected official's duties - may cross the line into materially adverse actions. *Boquist* and *Temple* reinforce this distinction, holding that tangible restrictions on an official's ability to perform their job

or participate in core functions of government can violate the First Amendment. The actions pled here mirror those concerns: they are not mere criticism or disagreement, but concrete, sustained, and targeted constraints on Plaintiff's speech and participation.

Accordingly, the allegations in paragraphs 22–30 of the proposed Second Amended Complaint sufficiently plead adverse actions under the First Amendment and render the amendment far from futile. These claims survive a motion to dismiss under Rule 12(b)(6).

F. **The Challenged Conduct Is Not Protected by Legislative Immunity Because It Falls Outside the Sphere of Legitimate Legislative Activity**

Under *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), legislative immunity shields public officials only when their conduct falls within the "sphere of legitimate legislative activity." This protection applies to formal legislative functions such as introducing legislation, voting on ordinances, or enacting general policy - all acts that are substantively legislative in nature and procedurally grounded in the mechanisms of deliberative governance. The dispositive question is not whether the official harbored retaliatory intent, but whether the act itself, viewed objectively, is legislative in both form and substance. *Id*. at 54–56.

As a threshold matter, whether legislative immunity applies to individual officials is analytically distinct from whether the City itself is immune. The Court's prior dismissal of Plaintiff's First Amendment claim did not engage this distinction. Nonetheless, the historical practice framework articulated in *Wilson* and applied in *Boquist* provides a practical and constitutionally grounded method for evaluating whether particular conduct falls within the legislative sphere. In *Boquist*, the court emphasized that "[f]ollowing

*Wilson's* guidance, we first review long settled and established historical practices to determine if similar sanctions were traditionally a part of legislative action." *Id*. at 782 (citing *Wilson*, 595 U.S. at 474).

The March 6, 2023, resolution imposed against Councilmember Dennis clearly crossed that constitutional line. Though framed as a formal censure, the resolution imposed a range of individualized restrictions not traditionally associated with legislative rebuke. It barred Plaintiff from meeting with staff outside limited virtual channels, required her communications to be filtered through the City Administrator, and sought to suppress her speech when critical of City personnel or policy. These were not policy decisions of general applicability, nor were they enacted through neutral, prospective legislation. Rather, they functioned as administrative sanctions tailored to isolate and silence a single dissenting official.

The historical deviation becomes even more apparent in light of Plaintiff's known disability. As someone with ADHD, Plaintiff relies on verbal processing, real-time engagement, and direct communication to carry out her duties. The resolution's restrictions imposed a disproportionate burden on her ability to deliberate, communicate, and participate meaningfully in governance. In this context, formalistic appeals to legislative process cannot obscure the tangible, exclusionary impact of the measures adopted.

Importantly, several of the adverse actions challenged here were not even authorized by the resolution. In the months following the March 6 censure, Plaintiff was excluded from staff meetings, silenced during debate, denied seconds to her motions, and subjected to additional restrictions imposed through email directives by non-legislative actors such

13

as the City Administrator and City Attorney. These measures were implemented without Council vote and lacked any foundation in the resolution itself. They represent precisely the kind of administrative reprisals that *Bogan* and *Wilson* distinguish from protected legislative acts.

To treat all such conduct as immune merely because it was adjacent to or initiated by a legislative act is to adopt a rigid formalism that defies constitutional logic. A categorical rule that shields all censures from review simply because they originate from a deliberative body would permit elected officials to strip their colleagues of voting rights, committee assignments, or access to council chambers - so long as the punishment is wrapped in the ceremonial language of legislative action. This approach would eviscerate the nuanced inquiry demanded by *Bogan*, where substance prevails over form, and where immunity turns on function, not fiat.

The Supreme Court in Wilson recognized this danger and expressly declined to endorse immunity for punitive measures that impair an elected official's core functions. Nonetheless, courts risk subverting that warning by invoking "legislative act" as an incantation to avoid scrutiny. At some point, as here, the conduct in question transcends democratic disagreement and becomes a mechanism of targeted suppression. Legislative immunity cannot, and should not, be construed to insulate such conduct from constitutional accountability.

## G. Recent Supreme Court Dissent Discussion *Wilson* Emphasizes the Importance of this Issue

Justice Jackson's dissent in the recent *Libby v. Fecteau*, 605 U.S. ---, 145 S. Ct. 1378, 1380–81 (2025), forcefully urges that lower courts be allowed to fully address the complex constitutional issues raised when sanctions impair an elected official's core functions, such as speaking and voting. Citing *Wilson*, she notes that the Court has yet to decide whether a censure "accompanied by punishment could constitute First Amendment retaliation." The constitutional questions at stake - concerning the limits of legislative ethics enforcement, judicial review of such sanctions, and the scope of First Amendment protections - remain unresolved. These same unsettled issues are present in Plaintiff's case, where vague speech prohibitions, exclusion from meetings, and ad hoc communication bans allegedly chill her protected speech. As Justice Jackson cautions, emergency intervention should be reserved for cases involving "critical and exigent circumstances," where the right to relief is "indisputably clear." Id. at 1379. Here, neither condition is met. Denying leave to amend would unjustly short-circuit the lower courts' essential role in resolving these novel and weighty constitutional questions through proper fact-finding and legal analysis Justice Jackson implores.

## II. PLAINTIFF'S PRIOR RESTRAINT CLAIM IS WITHDRAWN AND SUBSTITUTED FOR DECLARATORY RELIEF

Plaintiff no longer pursues a standalone prior restraint claim. Instead, she seeks declaratory relief that the City's enforcement of the September 13, 2024, Memorandum and related directives is unconstitutional under the First Amendment. These policies - particularly the speech prohibitions aimed at terms like "rubber stamping," "conflict of

interest," and "abuse of power" - operate as vague, overbroad, and content-based restrictions that chill protected speech.

This form of relief aligns with the approach taken in *Griffin v. Bryant*, 30 F.Supp.3d 1139 (D.N.M., 2014), where the court declined to entertain a prior restraint theory but nonetheless found the city's public meeting restrictions unconstitutional and subject to declaratory judgment. Griffin, a pro se plaintiff, challenged the Village's restrictions after being denied the opportunity to speak on agenda items and facing enforcement of Section 5F's "negative mention" prohibition during public input sessions. *Id*. at 1123–24. The Village Council meetings were structured to allow public input, but the rule barred speakers from making critical remarks about Village personnel or the Governing Body, effectively silencing dissent. *Id*. at 1144. Griffin alleged that this restriction, enforced by Village officials including the Mayor, Manager, and Clerk, violated his First Amendment rights by targeting his critical speech. *Id*. at 1124. He sought declaratory relief that the rule was void as vague, overbroad, and a form of censorship, as well as injunctive relief to prevent its enforcement. *Id*. at 1123.

The court ruled in the plaintiff's favor on the so-called "negative mention" rule, declaring it unconstitutional. 2023 WL 8892483, at *12–13. The rule impermissibly targeted critical speech about Village officials, rendering it viewpoint-based and thus unconstitutional in a limited public forum. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The court also found the rule overbroad, sweeping in protected political expression without sufficient justification. *Id*. at *13. While it declined to classify the rule as a prior restraint, the court nonetheless applied strict scrutiny and

granted declaratory and injunctive relief, holding that Section 5F chilled core political speech and failed constitutional muster. Id. at *11–13.

The September 13, 2024, Memorandum explains how the Code of Conduct, Rule 3C, in this case closely mirrors the "negative mention" rule found unconstitutional in *Griffin*. Both measures restrict critical speech in a limited public forum - namely, city council meetings - by prohibiting expressions that challenge official conduct. Just as *Griffin* barred "negative mention" of public officials, the Memorandum here proscribes terms such as "rubber stamping" and "abuse of power," directly targeting dissenting viewpoints. Like the rule invalidated in Griffin, the Memorandum is both viewpoint-based - penalizing disapproval while permitting supportive or neutral speech - and overbroad, sweeping in substantial protected expression without narrowly tailored justification. *Id*. at *12–13. Enforcement is similarly administrative rather than legislative: here, the City Clerk and City Attorney impose restrictions without council vote, paralleling the role of the mayor, manager, and clerk in *Griffin*. The Rule and Memorandum's vague prohibitions on "derogatory remarks" invite discretionary enforcement that chills speech, especially when applied, as here, to Plaintiff's specific phrases critical of official conduct.

Consider for a moment the impact: Council Members in the City of Rochester are not allowed to discuss corruption, abuse of power, or accuse other members of illegal behavior because, well, that's just not nice. The issue with this seems obvious.

## CONCLUSION

The proposed Second Amended Complaint corrects the deficiencies identified by this Court by advancing new factual allegations and legal theories that fall outside the scope

17

of legislative immunity and squarely within established First Amendment protections. It alleges retaliatory conduct not previously pled, including non-legislative sanctions that materially burden Plaintiff's duties and suppress her speech. The request for declaratory relief - now narrowed and refined - mirrors relief granted in analogous cases and seeks judicial review of overbroad and viewpoint-based restrictions imposed by unelected officials. The claims are plausible, non-futile, and entitled to full consideration under Rule 15. For these reasons, Plaintiff respectfully requests that the Court grant her motion for leave to file the proposed Second Amended Complaint.

Respectfully submitted,

**QUANTUM LEX PA**

DATED: July 11, 2025

By: s/ John Hayden
John R. Neve (278300)
John Hayden (504136)
6800 France Ave S, Suite 405
Minneapolis, MN 55435
(952) 746-2400

and

/s/ Paul T. Ostrow
Attorney Identification No. 151889
Ostrow Law LLC
Minneapolis, Minnesota 55418

ATTORNEYS FOR PLAINTIFF