IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Molly L. Dennis,<br><br>Plaintiff,<br><br>v.<br><br>City of Rochester, and Kim Norton, in her individual as well as official capacity as the mayor of the City of Rochester,<br><br>Defendants. | Case No. 24-cv-00426 (PJS/DLM)<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Dennis's claims seek to turn disputes over Council governance, meeting procedures, and political consequences into disability discrimination and reprisal claims. The record and governing law do not permit that result.

Dennis's ADA and MHRA discrimination claims fail at the threshold because those statutes protect access to public services by members of the public, not an elected Council Member's participation in the City's internal operations. Even if the statutes applied, the City fulfilled its obligations by engaging in the interactive process and providing extensive accommodations. The City was not required to adopt Dennis's preferred accommodation of stopping every Council meeting every hour, particularly when reasonable alternatives were available and the requested accommodation would have created an undue hardship. Her intentional-discrimination theory fails too because she has no direct or circumstantial evidence

that the City took any challenged action because of her disability, rather than in response to conduct and governance concerns.

Dennis's reprisal claim also fails as a matter of law. The conduct she identifies, including communication restrictions, support for another political candidate, discretionary decisions about ride-alongs and office access, limitations on nonessential one-on-one meetings, the City Attorney's legal guidance and communication boundaries, and alleged reputational harm, was neither materially adverse nor causally connected to any protected activity.

Finally, Dennis's damages theories cannot survive, even if liability could. Compensatory damages under the ADA require deliberate indifference, and her claimed damages for a lost Council seat and future employment are speculative as a matter of law. The Court should grant summary judgment.

## STATEMENT OF FACTS

### A. The Rochester City Council governs through established rules designed to keep meetings orderly and City business moving.

The Rochester City Council is responsible for local lawmaking, budget oversight, and representing community interests.[1] Council Members represent constituents and vote on City policies, ordinances, and procedures during

[1] *See* Exhibit 1 (hereafter, "Dennis Dep. Tr. Vol I") at 35:02–36:19; Exhibit 5, Code of Conduct Chapters 1 and 2. Unless otherwise noted, all "Exhibits" are exhibits to the declaration of Jenny Gassman-Pines.

meetings.[2] Each City Council Member shares the same responsibilities.[3] The City Council governs itself through Rules of Procedure and Code of Conduct (together "Council Rules").[4] Each Council Member votes to approve the Council Rules, which apply to all Council Members.[5]

The Council Rules set out how the City Council operates. During the relevant time, as now, the Council Rules provided that Council Members act collectively as a governing body rather than individually, and City staff are responsive to the Council as a whole, not individual members.[6] The Council Rules clarified that staff need not undertake projects or investigations solely at an individual Council Member's request.[7] Staff requests requiring more than thirty minutes of work required approval from the full Council.[8] Under the Council Rules, Council Members interacted with staff through senior-level City leaders.[9] Council Members had to be "courteous in their language and demeanor," not engage in "disorderly behavior,"

---

[2] *See* Dennis Dep. Tr. Vol I at 35:02–36:19; Exhibit 5, Code of Conduct Chapters 1 and 2.

[3] Exhibit 5, Code of Conduct at 1.01.

[4] *See generally* Exhibit 5.

[5] Dennis Dep. Tr. Vol I at 38:01–39:21, 42:14–43:25.

[6] Exhibit 5, Code of Conduct at 1.01 and 3.01.

[7] *Id.* at 3.01–.02.

[8] *Id.* at 3.02.

[9] *Id.* at 3.01–.03.

and not make "personal comments," "derogatory remarks," or "insinuations" directed at other Council Members, City staff, or the public.[10]

### B. Dennis became a Council Member in 2021.

Plaintiff Molly Dennis was elected to the Rochester City Council and served as a Council Member beginning in 2021.[11] Dennis developed a tense relationship with several City elected officials and staff.[12] Dennis accused City leaders of discriminating against her as early as mid-2022.[13]

Alison Zelms is the Rochester City Administrator.[14] As part of her role, Zelms had recurring one-on-one meetings with Council Members to discuss constituent concerns, upcoming agenda items, and other City business.[15] Beginning when Dennis took office, Zelms and Dennis met regularly so Zelms could share information relevant to Dennis's Council duties.[16] Zelms' meetings with Dennis were

---

[10] Exhibit 5, Rule of Procedure 3(C).

[11] Dennis Dep. Tr. Vol. I at 34:16-22. Because of the COVID-19 pandemic, the Rochester City Council frequently met remotely from the time Dennis took office until approximately March 21, 2022. *See* Exhibit 3 at 1 (permitting the public to attend the meeting in person at Government Center).

[12] Spindler-Krage Decl. ¶ 3; Norton Decl. ¶ 3.

[13] Zelms Decl. ¶ 6; Spindler-Krage Decl. ¶ 3; Norton Decl. ¶ 3; *see* Exhibit 4 ("The phone call we had today was again filled with accusations (again, many of them serious, with legal implications; e.g. 'discrimination,' 'slander'), as well as your grievances and demands for information.").

[14] Zelms Decl.¶ 1.

[15] Zelms Decl. ¶ 2.

[16] Zelms Decl. ¶ 3; Exhibit 2 (hereafter, "Dennis Dep. Tr. Vol II") at 15:17–16:23.

frequently longer than those with other Council Members because Dennis used the time to raise personal concerns, interpersonal conflicts, and matters City staff or the Council had already addressed.[17]

Rochester Mayor Kim Norton also occasionally met one-on-one with Council Members, although she viewed those meetings as informal and optional, and participation varied among Council Members.[18] Norton's meetings with Dennis often lasted longer than those with other Council Members because Dennis used the time to discuss personal matters and disputes with colleagues and City staff, rather than City business.[19]

### C. The City engaged in the interactive process with Dennis and provided accommodations.

In April 2021, shortly after taking office, Dennis formally disclosed that she had ADHD and submitted supporting documentation from her healthcare provider in connection with a request for accommodations.[20] According to her provider, Dennis had difficulty with meetings lasting beyond three or four hours because of her ADHD.[21] The provider requested that Dennis be permitted to take five-to-seven-minute breaks from meetings every 60 to 90 minutes so that Dennis could "get up,

---

[17] Zelms Decl. ¶ 4.

[18] Norton Decl. ¶ 4; *see also* Dennis. Dep. Tr. Vol. II at 113:11–113:20.

[19] Norton Decl. ¶ 5.

[20] Exhibit 6.

[21] *Id.*

stretch, step away from the meeting, focus on hydration, and then return to the meeting alert and ready to work."[22] The provider letter did not identify any other accommodations needed for Dennis to perform her Council Member duties.[23]

Under the Council Rules, the whole Council took a 10-minute break from meetings every 90 to 120 minutes, between agenda items.[24] Additionally, Council Members, like all meeting participants, were permitted to take breaks or step away from the meeting as needed.[25]

In August 2022, Dennis submitted updated documentation in support of additional accommodation requests related to her ADHD.[26] Dennis's provider requested the City provide Dennis with the following accommodations: (1) hourly movement breaks; (2) printed materials to assist with organizing and processing information; (3) access to a pen and paper; (4) access to water, and (5) restroom breaks as needed.[27]

Following an interactive process, the City agreed to provide several accommodations: (1) scheduled breaks during Council meetings every 90 to 120

---

[22] *Id.*; *see* Dennis Dep. Tr. Vol. I at 59:04–20.

[23] Exhibit 6.

[24] Exhibit 5, Rule of Procedure 1(F).

[25] Spindler-Krage Decl. ¶ 6

[26] Exhibit 7.

[27] *Id.*; Dennis Dep. Tr. Vol. I at 58:07–59:03.

minutes, (2) the ability to stand during meetings through the use of a "mobile desk" with a microphone, a standing desk platform at the dais, and a clipboard; (3) remote printing to a City printer and up to six ink cartridges for her home printer; (4) access to water, pen and paper, and restroom breaks as needed; (5) the ability to monitor meeting proceedings during breaks through a livestream on her phone; and (6) advance access to digital presentations when practicable.[28] The City also continued providing printed Council packets and incorporating regular breaks into Council meetings.[29]

Dennis rejected many of the accommodations the City proposed. For example, although the City provided a mobile desk with a microphone and a standing-desk platform for use during Council meetings, Dennis complained that the mobile desk would place her off-camera and that neither option addressed her desire to leave the chamber for restroom breaks.[30] Similarly, Dennis rejected the City's proposal that she monitor Council meetings through a livestream on her phone while taking breaks. She testified that she did not want to bring a cell phone into the restroom and was concerned about potentially missing information—although Dennis could not identify any meeting in which she missed information

[28] Exhibit 8.

[29] *Id.*

[30] Dennis Dep. Tr. Vol. I at 79:01–12, 91:13–24.

necessary to cast a vote, and she acknowledged that other Council Members occasionally stepped away and missed votes during her tenure on the Council.[31] Dennis expressed concerns about the printed Council packets, testifying that they were lengthy and that one packet was not "correct."[32] Dennis also rejected the City's offer of remote printing because it "was not confidential," but she acknowledged the City provided her with ink cartridges for her personal printer.[33]

The only accommodation Dennis requested via her supplemental materials that the City did not provide was a full Council meeting break every hour.[34] The City determined that requiring hourly Council-wide recesses would significantly burden the Council, the Mayor, City staff, and the public, particularly because Council meetings routinely extend late into the evening.[35] Each regular meeting carries a full agenda of ordinances, resolutions, public hearings, and other City business.[36] Stopping the Council meetings every hour would require the Council to shorten its agenda and deliberations or extend meetings even later, risking reduced attendance.[37]

---

[31] *Id.* at 93:13–94:19.

[32] Dennis Dep. Tr. Vol. I at 90:06–18.

[33] Dennis Dep. Tr. Vol. I at 92:13–24.

[34] Exhibit 8; Spindler-Krage Decl. ¶ 8.

[35] Spindler-Krage Decl. ¶ 8.

[36] *Id.*

[37] *Id.*

### D. Following concerns regarding Dennis's conduct, the Council censured Dennis.

In 2022 and early 2023, City staff repeatedly raised concerns about Dennis's interactions with Council colleagues and City employees.[38] Staff reported that Dennis called meetings with staff without identifying a topic, redirected discussions to past grievances unrelated to City business, and demanded staff time beyond the thirty minutes the Council Rules allowed without full Council approval.[39] In response, City leadership met with Dennis in July 2022 to establish communication parameters and clarify expectations for staff interactions.[40] The concerns continued into 2023, culminating at the February 27, 2023 City Council Study Session.[41] On March 6, 2023, the Rochester City Council formally censured Dennis for conduct before, during, and after that Study Session, imposing conduct-related restrictions.[42] Dennis continued to serve on the Council, to attend and participate in Council meetings, and to interact with staff.[43]

---

[38] Zelms Decl. ¶ 5.

[39] *Id.*

[40] *Id.* ¶ 6

[41] *Id.* ¶ 7.

[42] Exhibit 9.

[43] Zelms decl. ¶¶ 7–8; *see also* Dennis Dep. Tr. Vol. II at 57:18–59:10; Exhibit 3 at CITY0018026–39, CITY0018057–74, and CITY0018202–13 (Council meeting minutes reflecting Dennis's participation, post-censure).

Dennis complained that the censure was discriminatory, and the City retained independent investigator Ann Goering to investigate.[44] Goering reviewed documents and interviewed key witnesses including Dennis, other Council Members, Norton, Zelms, and City Attorney Michael Spindler-Krage.[45] The investigator found evidence substantiating the concerns underlying the censure and concluded that the restrictions resulted from Dennis's conduct, tracked the Council Rules, and were not discriminatory.[46]

### E. Dennis sought additional accommodations, which the City provided.

In June or July 2023, Dennis provided the City with a letter from Mayo Clinic physician Dr. Wilfahrt containing updated accommodation recommendations.[47] The letter reaffirmed the accommodations for ADHD identified in Dennis's August 2022 accommodation letter.[48] Dr. Wilfahrt additionally reported that Dennis suffered from carpal tunnel syndrome and recommended accommodations designed to reduce repetitive typing, including dictation software or other

[44] Spindler-Krage Decl. ¶ 4; Exhibit 10.

[45] Exhibit 10.

[46] *Id.*

[47] Exhibit 11.

[48] *Id.*

communication aids.[49] Dr. Wilfahrt did not propose any additional accommodations related to Dennis's ADHD and did not identify any other conditions requiring accommodation.[50] He stated that additional information might be forthcoming, but was not then available:

> In addition to the carpal tunnel syndrome, Mrs. Dennis continues to be evaluated for other medical problems; she has been referred to clinicians outside the Department of Family Medicine. Pending the outcome of those other evaluations, she ***might in the future*** have named additional accommodations in support of her communication and cognition.[51]

Dennis never provided information to the City regarding the outcome of the other evaluations, nor did she provide any other accommodation letter seeking additional accommodations in support of her communication and cognition.[52]

In response to Dr. Wilfahrt's June 2023 recommendations, the City continued the interactive process.[53] On August 11, 2023, the City offered additional accommodations for Dennis's carpal tunnel, including Dragon speech-recognition software to reduce typing and a process for Dennis to request virtual meetings with

---

[49] *Id.* (recommending that Dennis limit typing to no more than fifteen minutes per hour).

[50] *See id.*

[51] *Id.* (emphasis added).

[52] Spindler-Krage Decl. ¶ 10; Dennis Dep. Tr. Vol. I at 119:22-120:05.

[53] Spindler-Krage Decl. ¶ 9.

City employees through Department Heads.[54] After further discussions during August and September 2023, the City issued a second accommodation letter on October 12, 2023, confirming the other offered accommodations: a standing desk platform, mobile podium, note-taking materials, a video monitor outside council chambers, and livestream access on Dennis's phone so that she could continue participating in Council meetings while taking breaks.[55]

### F. Dennis's Conduct Further Deteriorated Her Working Relationships.

Following the censure, Dennis took a series of actions that further strained her relationships with City officials, Council colleagues, and staff. She recorded several conversations with City officials without their knowledge, including Norton (June 2023) and Zelms (early 2023).[56] On at least one occasion, Dennis then sent the recording to the press.[57] After Norton learned Dennis was recording their conversations and distributing the recordings to the media, she told Dennis that she

[54] *Id.*; Exhibit 12 (incorrectly dated as August 11, 2022, rather than August 11, 2023—see Dennis Dep Tr. Vol. I at 124:01–08).

[55] Exhibit 13.

[56] *See* Norton Decl. ¶ 6; Zelms Decl. ¶ 10; Dennis Dep. Tr. Vol. I at 125:05–126:20; Dennis Dep. Tr. Vol. II at 13:02-06, 99:01–106:01, 110:17–21.

[57] Dennis Dep. Tr. Vol. II at 111:07–114:03; *see also* R. Petersen, *Rochester mayor cancels regular monthly meetings with censured council member*, Post Bulletin (July 19, 2023 at 5:19 p.m.) https://www.postbulletin.com/news/local/rochester-mayor-cancels-regular-monthly-meetings-with-censured-council-member.

would not continue their meetings unless Dennis agreed not to record her.[58] Dennis refused.[59]

At the same time, Dennis repeatedly acted outside the Council Rules governing interactions between Council Members and City staff.[60] The Council Rules provide that the Council exercises authority collectively and that only the Council *as a whole* may direct staff or commit City resources.[61] Compliance with that structure is necessary to ensure that City business is conducted through established governance processes.[62] Dennis's directives also required staff to expend significant time and resources on projects that had not been authorized by the Council, placing staff in the difficult position of either declining the requests of an elected official or diverting resources from Council-authorized priorities.[63]

Dennis also required City officials and staff to devote substantial time and attention to inflammatory, personal disputes unrelated to the City's core operations. For example, at one point Dennis publicly asserted that City was "harming" her children.[64] Concerned by those allegations, Spindler-Krage reviewed Dennis's

---

[58] Norton Decl. ¶ 7.

[59] *Id.*

[60] Zelms Decl.¶ 5.

[61] Exhibit 5 at 3.01–3.02.

[62] Zelms Decl.¶ 9.

[63] *Id.* ¶ 8.

[64] *See* Exhibit 14; *see also* Dennis Dep. Tr. Vo. II at 45:05–11.

publicly available family-court file, which contained judicial findings concerning her involvement of her children in a separate dispute.[65] Spindler-Krage then referenced portions of that publicly available order in an internal email exchange among Dennis and several senior City officials; he did not release the order publicly.[66] Dennis then forwarded Spindler-Krage's email to the Post Bulletin newspaper.[67]

By late 2023, the deterioration in these working relationships required City leadership to remind Dennis of the Council Rules pertaining to her interactions with staff. On December 26, 2023, City Administrator Alison Zelms reminded Dennis about certain boundaries, consistent with the Council Rules and existing limits on staff time.[68] Zelms explained that Dennis could meet with lower-level staff if a Department Head, Deputy Administrator, or the City Administrator attended, and that meetings generally would occur virtually unless the City approved an exception.[69] Zelms further advised that staff could end participation if a meeting moved away from City business and instead focused on prior conflicts, grievances, or other non-City matters.[70] The email also emphasized that Dennis's staff

[65] *See* Exhibit 14.

[66] *Id.*

[67] Exhibit 15.

[68] Exhibit 16.

[69] *Id.*

[70] *Id.*

interactions had to remain reasonable and that the City could impose additional parameters if her meeting requests became excessive.[71]

Similarly, Spindler-Krage set boundaries for legal questions. In 2023, he asked Dennis to submit legal questions in printed or handwritten form through inter-office mail or hand delivery. Spindler-Krage made that request after months of tense text, phone, and email exchanges in which Dennis repeatedly raised personal grievances, accused him and other City officials of wrongdoing, and sought further explanations regarding matters that had already been addressed, including the censure process, communication restrictions following the censure, interactions with City staff, and other disputes concerning City governance.[72]

### G. Dennis sued the City she represented, and ultimately did not win reelection to the City Council.

On January 22, 2024, while still an active Council Member, Dennis commenced this action.[73]

---

[71] *Id.*

[72] *See, e.g.*, Exhibit 20 (exemplar exchange).

[73] Compl. (ECF No. 1-1.)

On August 13, 2024, Dennis lost the primary for her City Council seat.[74] Her term expired on January 6, 2025.[75] After Dennis lost her campaign for re-election, she was unemployed for a period of time before working at Breaking Barriers from November 11, 2025 to December 24, 2025.[76]

After motion practice, Dennis's only remaining claims are discrimination under Title II of the ADA and the MHRA, and reprisal under the MHRA.[77] Dennis's discrimination claims are based on both the City's alleged failure to accommodate her disability and disparate treatment.[78] Dennis's reprisal claim is based on her perception that certain individuals "are treating [her] differently than they treated [her] before" she "called out discrimination."[79] Specifically, Dennis claims she has been ostracized or excluded from her church (the First Unitarian Church of Rochester), other community groups (Indivisible 507, Isaiah/Faith in Minnesota,

---

[74] *See* S. Baker, *Embattled Rochester council member ousted in primary, blames local media*, The Minnesota Star Tribune (Aug. 13, 2024) https://www.startribune.com/embattled-rochester-council-member-ousted-in-primary/601107426.

[75] *See* City of Rochester City Council, Minutes of Regular Meeting (Jan. 6, 2025) https://rochestermn.granicus.com/MinutesViewer.php?view_id=1&clip_id=4498&doc_id=1d62b051-cd0f-11ef-a9e2-005056a89546 (listing Council Members present and voting; Molly Dennis spoke as a resident during the "Open Comment" period).

[76] Exhibit 19 at BB0310, BB0329.

[77] March 11, 2025 Order (ECF No. 51).

[78] *Id.* at 2 n.1.

[79] Dennis Dep. Tr. Vol. II at 40:11-22.

Minnesota Neurodivergent), and a former employer (Breaking Barriers). Dennis testified that she perceives these actions as "interconnected" with the City and Norton.[80] Dennis could not identify any specific action Norton or the City took in connection with those groups, and admitted that she does not follow Norton, does not listen to her conversations, and does not know what Norton says in most settings.[81] She also refused to identify the individuals who allegedly told her that Norton spoke poorly of her, and said that she does not intend to call those individuals as witnesses.[82]

Dennis seeks $75,000 per year on an ongoing basis for her alleged inability to obtain employment in Rochester, along with damages tied to the loss of her Council seat.[83]

**LEGAL ARGUMENT**

Defendants are entitled to summary judgment on Dennis's claims and on certain categories of claimed damages. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex*

[80] *Id.* at 33:08–36:09.

[81] *Id.* at 46:20–48:14, 56:08–57:05.

[82] *Id.* at 59:11-19.

[83] Exhibit 17 (Response to Interrogatory No. 9).

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). That standard resolves this case. Dennis's disability-discrimination claims fail because Title II and the MHRA do not convert an elected official's disputes over internal municipal governance into public-access claims; even if they applied, the City provided reasonable accommodations and imposed conduct-based limits for non-discriminatory reasons. Dennis's reprisal claim fails because the challenged actions were not materially adverse and were not caused by protected activity. And even if Dennis could prove liability, the record does not support deliberate indifference, lost-election damages, or speculative future-employment damages.

## I. The City is entitled to summary judgment on Dennis's discrimination in public access claims.

Dennis's discrimination claims (Counts I and III) fail for two reasons. First, the ADA and MHRA protect access to public services by members of the public; they do not regulate how an elected Council Member performs her role on the government side of that relationship. Second, even if Dennis could invoke those statutes, she cannot make even a prima facie showing of discrimination. Instead, the record shows that the City engaged in the interactive process, provided extensive accommodations, and did not treat her differently because of her disability.

### A. Dennis's ADA and MHRA claims fail because they do not involve the denial of a public service, program, or activity.

Dennis's ADA and MHRA claims fail as a matter of law because they do not involve the denial of any public service, program, or activity. Title II of the ADA

prohibits a public entity from excluding a qualified individual with a disability from participation in, or denying that individual the benefits of, the entity's services, programs, or activities because of the individual's disability. 42 U.S.C. § 12132. The MHRA contains a similar prohibition, making it unlawful to discriminate based on disability in access to or use of a public service. Minn. Stat. § 363A.12, subd. 1. Because courts generally apply the same analytical framework to claims under both statutes, the claims rise or fall together. *See Somers v. City of Minneapolis*, 245 F.3d 782, 788 (8th Cir. 2001); *Thao v. City of St. Paul*, 481 F.3d 565, 567 n.3 (8th Cir. 2007).

The text of both statutes distinguishes between governmental entities that provide public services and individuals who receive them. Title II protects a "qualified individual with a disability" who meets the essential eligibility requirements for "the *receipt* of services" or the participation in programs or activities "*provided by* a public entity." 42 U.S.C. § 12131(2) (emphasis added). The MHRA likewise protects a person's "access to," "admission to," "full utilization of," or "benefit from" a public service. Minn. Stat. § 363A.12, subd. 1. Both statutes therefore contemplate the same relationship: a governmental entity provides a service, and another person—the "public"—receives, accesses, utilizes, or benefits from it.

Because Congress did not define "services," "programs," or "activities," the Court should give those terms their ordinary meaning, and those meanings reflect a public-facing relationship. *See In re Restorff*, 932 N.W.2d 12, 19 (Minn. 2019). "Services" means "[t]he provision to the public of something," such as a utility. *Am. Heritage Dictionary* 754 (5th ed. 2011). "Programs" are "system[s] of services, opportunities, or projects, usually designed to meet a social need." *Id.* at 666. And although "activities" can be defined broadly, its usage alongside the narrower "services" and "programs," reveals its similar narrow scope. *See Kuklenski v. Medtronic USA, Inc.*, 702 F. Supp. 3d 783, 789 (D. Minn. 2023) ("Because the meaning of a phrase often depends on how it is being used in the context of the statute, courts examine the words and phrases in context."). Likewise, the MHRA's focus on "access," "admission," "utilization," and "benefit" describes the relationship between a public service and its user. *See, e.g.*, *Am. Heritage Dictionary* 5, 11, 80, 894 (5th ed. 2011). Read naturally, both statutes regulate public access to governmental outputs, not the internal processes by which government officials create, administer, or deliver those outputs.

Courts interpreting Title II have consistently recognized the distinction between public services and internal governmental operations. In *Zimmerman v. Oregon Department of Justice*, the Ninth Circuit concluded that a government employee could not pursue a Title II claim against his public employer because the

employment relationship is fundamentally different from the provider-recipient relationship described in the statute. 170 F.3d 1169, 1174–76 (9th Cir. 1999). The employee sought not to receive a governmental service, but to alter the conditions of his working relationship with the government. As the court explained, the statute's operative terms assume "that the public entity provides an output that is generally available, and that an individual seeks to participate in or receive the benefit of that output." *Id.* at 1174. The Seventh Circuit reached the same conclusion in *Brumfield v. City of Chicago*, 735 F.3d 619, 628 (7th Cir. 2013), holding that Title II covers discrimination in the "outputs" of government and the "delivery of public services," but not "the internal operations of state or local government." *Id.* Together, these decisions recognize the same dividing line: public-accommodation and public-services laws protect access to governmental services, not participation in governmental decision-making or internal governmental functions.

Dennis falls on the governmental side of that line, not the recipient side. Dennis's claims concern the City's internal governance and the performance of governmental functions, not the denial of any public service, program, or activity. She does not allege that she was denied access to a City service available to members of the public. Instead, she challenges matters such as access to City staff, participation in internal deliberations, communications among elected officials, and other mechanisms through which the City conducts municipal business. Those are

not governmental benefits furnished to recipients of public services. They are the means through which the City's governing body performs its work.

Indeed, Dennis is even further removed from the role of a service recipient than the employee in *Zimmerman*. She was not merely employed by the City; she held office by election and served as a member of the City Council itself. In that capacity, she helped direct and oversee the provision of municipal services to the public. If Title II does not extend to a government employee seeking to alter the internal workings of government, it necessarily does not extend to an elected official who serves as part of the governing body itself.

That conclusion is consistent with this Court's prior observation that "Dennis was not a servant of the City, but of the people who elected her," raising the question "how public accommodation laws apply to someone who would generally be considered on the public entity side of a dividing line between the public entity and the public it serves." *Dennis v. City of Rochester*, No. 24-cv-426 (PJS/DLM), 2024 WL 5508592, at *7, *11 (D. Minn. Oct. 30, 2024); *see also id.*, 2025 WL 758634, at *1 (D. Minn. Mar. 11, 2025) ("For example, the Court struggles to understand what 'service' was made available to the 'public' but not to Dennis."). The public accommodation laws do not apply here. The ADA and MHRA guarantee equal access to public services; they do not regulate disputes over how a legislative body conducts its internal affairs. Because Dennis challenges the City's internal

governance, rather than the denial of any service, program, or activity provided to a recipient of public benefits, her public services claims fail as a matter of law.

### B. If the ADA and MHRA apply, Dennis's claims also fail because she cannot establish discrimination as a matter of law.

Even if the ADA and MHRA applied to Dennis, she cannot prove disability discrimination. Dennis advances two theories: that the City failed to accommodate her disability, and that the City intentionally discriminated against her because of her disability. Both fail.

#### 1. The City provided reasonable accommodations that gave Dennis meaningful access.

In determining whether Dennis lacked meaningful access because of her disability, the relevant comparison is whether a disabled individual had practical access comparable to non-disabled colleagues, not whether the individual received her preferred accommodation. *Segal v. Metro. Council*, 29 F.4th 399, 404 (8th Cir. 2022). Identical results are not required; the question is "whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003); *see Loye v. Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010).

A public entity must make reasonable accommodations to give meaningful access, but it need not grant an accommodation that imposes an undue hardship. *See Gardea v. JBS USA, LLC*, 915 F.3d 537, 542 (8th Cir. 2019) (noting requiring assistance from other employees was "not a reasonable accommodation"). "[A]n

accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated under the ADA." *Id.* (citation omitted).

The record establishes that the City satisfied its obligation to provide reasonable accommodations. After Dennis disclosed her ADHD and later submitted supporting medical documentation, the City engaged in multiple, extensive interactive processes and implemented numerous accommodations tailored to her documented limitations.[84] The only accommodation Dennis requested that the City ultimately declined was her demand that the entire Council recess every hour so that she could take a break without missing discussion.[85] The City determined that requiring mandatory hourly, Council-wide recesses would impose an undue hardship on the Council's operations.[86] It instead offered a variety of alternative accommodations designed to address her ADHD-related need for movement and restroom breaks: Beyond providing whole-meeting breaks every 90 to 120 minutes and permitting Dennis, like all Council Members, to excuse herself from meetings whenever needed, the City offered her a standing desk platform at the dais, a mobile podium with a microphone that would allow her to move about the chamber while continuing to participate in meetings, and access to a livestream of Council

[84] *See* Exhibit 8; Exhibit 12; Exhibit 13.

[85] Spindler-Krage Decl. ¶ 8; *see also* Dennis Dep. Tr. Vol. I at 78:21-79:12.

[86] Spindler-Krage Decl. ¶ 8.

proceedings on her phone so that she could continue to monitor discussions while away from the chamber.[87] Although Dennis may have *preferred* the entire Council recess when she stepped away, neither the ADA nor the MHRA requires the City to grant Dennis's preferred accommodation—just a reasonable one. *See Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 942–43 (8th Cir. 2018) ("An employer only has to provide an accommodation that is reasonable, not an accommodation the employee prefers.").

Dennis's preferred accommodation was neither reasonable nor required under the ADA because it would have imposed an undue hardship on the City's operations. It is undisputed that Council meetings frequently extended late into the evening and involved lengthy agendas.[88] Requiring additional breaks would have forced the City either to curtail deliberations and agenda items or to prolong meetings even further, thereby reducing efficiency and risking diminished participation.[89] These are not speculative concerns or minor inconveniences, but a material disruption of the Council's ability to conduct public business and perform its legislative functions. The ADA does not require public entities to adopt

[87] Exhibit 12; Exhibit 13; Spindler-Krage Decl. ¶¶ 7–8.

[88] Spindler-Krage Decl. ¶ 8; *see also* Exhibit 18 (Dennis says the "length of [Council] meetings is hurting people" and "create[s] bad government with exhausted/confused policy makers").

[89] Spindler-Krage Decl. ¶ 8.

accommodations that fundamentally alter their operations or impose such substantial burdens. *See Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 655 (8th Cir. 1995) (concluding that anything more than a "de minimis" cost to conducting business is an undue hardship); *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1028 (8th Cir. 1999) (public entities are not required to make accommodations that "substantially alter the nature of the program" they operate); *see also Gardea*, 915 F.3d at 542 ("An accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated under the ADA."). The ADA requires reasonableness—not significant operational burdens on core governmental functions.

The possibility that a vote might occur while Dennis was briefly out of chambers does not amount to a denial of meaningful access. The law does not require absolute assurance that an individual will never miss any portion of a proceeding. *See Medina v. City of Cape Coral, Fla.*, 72 F. Supp. 3d 1274, 1278–79 (M.D. Fla. 2014) (access on all but "rare occasions" is still meaningful access). In fact, Dennis concedes that other Council Members missed discussions and votes from time to time during her tenure.[90] That occasional absence from a vote was an ordinary feature of Council proceedings, not evidence that Dennis was denied access because of her disability.

---

[90] Dennis Dep. Tr. Vol. I at 93:07–94:05.

Furthermore, inconvenience or difficulty does not establish lack of meaningful access. *See Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1086 (11th Cir. 2007) (concluding communication was effective even though it was not "perfect"); *Ganstine v. Sec'y, Fla. Dep't of Corr.*, 502 F. App'x. 905, 910 (11th Cir. 2012) (concluding there was meaningful access notwithstanding limitations and inconvenience caused by the plaintiff's disability). Dennis remained a Council Member with the same voting power, meeting access, and ability to participate in City business as her colleagues.

Dennis's remaining accommodation allegations fare no better. At bottom, she contends that the City should have altered its communication practices to conform to her communication style. But neither the ADA nor the MHRA requires a public entity to restructure its communication methods, offer exemptions from generally applicable rules, or require employees and elected officials to communicate on a disabled individual's preferred terms. As the Eighth Circuit has explained, communication need only be "effective;" it need not be "identical" to the methods used by others. *See Loye*, 625 F.3d at 499; 28 C.F.R. § 35.160(a)(1).

The undisputed record shows that the City accommodated Dennis's documented communication-related limitations. None of Dennis's accommodation letters required City staff or Council Members to abandon email, rely primarily on telephone calls or text messages, or otherwise alter their ordinary communication

practices. Nor does the medical documentation support such a requirement. Dennis is not an expert on ADHD,[91] and her personal views regarding how individuals with ADHD prefer to communicate cannot substitute for medical evidence regarding reasonable accommodations. Moreover, Dr. Amy Steiner, Defendants' expert, concluded that Dennis's medical records did not identify a clinically supported need for unrestricted staff access, exemption from standard communication boundaries, or a requirement that others modify their communication style as a medical accommodation,[92] further confirming that Dennis's preferred communication methods were not medically necessary accommodations.

The accommodation requirement is intended to place individuals with disabilities on equal footing, not to provide greater access to staff, control over how government officials conduct their work, or authority to dictate how others communicate. Because Dennis's requested communications would have required City staff and elected officials to alter their own work practices to suit her preferences, they were not required as a matter of law.

---

[91] Dennis Dep. Tr. Vol. I at 34:06–15.

[92] *See* Opinion 1 of the June 17, 2026 Record Review and Expert Opinion of Dr. Amy Steiner, PsyD, LP, ABPP (ECF No. 131).

**2. The City did not intentionally discriminate against Dennis because of her disability.**

Dennis also claims that the City treated her differently than non-disabled Council Members when, following the censure, it imposed restrictions on her interactions with City staff and other aspects of her Council participation. To support her claim, Dennis must prove differential treatment *because* of her disability. *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004). The key element is discriminatory intent. *Id.*; *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014) (disparate treatment claim requires proof of discriminatory intent). Accordingly, Dennis must prove her claim with direct evidence of intent or indirect evidence through the three-step *McDonnell Douglas* burden-shifting framework. *Peebles*, 354 F.3d at 766; *Nelson v. Am. Mod. Ins. Grp., Inc.*, No. 23-CV-525 (LMP/JFD), 2025 WL 918528, at *3 (D. Minn. Mar. 26, 2025). She fails to make either showing.

Dennis offers no direct evidence of the City's discriminatory intent. "Direct evidence is that which shows a specific link between the alleged discriminatory animus and the challenged decision," such as evidence of conduct or statements by persons involved in the decision-making process. *Audette v. Lake of the Woods Cnty.*, 183 F.4th 627, 637 (8th Cir. 2026) (citations omitted). Such evidence must be "sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* Dennis offers no such evidence.

Dennis likewise fails to adduce any indirect evidence of discrimination. To make a prima facie showing, Dennis must demonstrate that: (1) she is a qualified individual with a disability; (2) the City excluded her participation in or denied her the benefits of a public service, program, or activity; and (3) such exclusion was because of her disability. *See Hall v. Higgins*, 77 F.4th 1171, 1181 (8th Cir. 2023). Even assuming Dennis can satisfy the first element, she does not have prima facie evidence of the second and third elements.

As explained above, Dennis cannot identify a publicly available service, program, or activity from which she was excluded. At most, she contends that the City failed to organize Council meetings and internal communications according to her preferred methods for performing her Council role and interfacing with City staff. But Council recesses, communications between Council Members and City staff, and administration of Council Rules are not public services. Nor did the challenged practices exclude Dennis from municipal governance. City staff serve the Council as a whole, and Council Rules limit individual demands on staff time and resources. Requiring Dennis to route requests through Department Heads, include supervisors on communications, conduct meetings virtually absent an exception, and keep staff meetings focused on City business did not deny her access to City government. It required her to operate within the same governance framework that applied to every Council Member.

Dennis's claim fails for a second, independent reason: there is no evidence that any challenged action occurred because of her disability. Intentional discrimination requires more than mere volition or awareness—instead, Dennis must show that the decisionmaker "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Audette*, 183 F.4th at 637. She has no such evidence.

The undisputed record shows that the restrictions Dennis challenges arose from concerns about her conduct and adherence to Council Rules, not from her ADHD. City officials cited, among other things, Dennis's practice of secretly recording meetings and one-on-one conversations with City officials without informing them;[93] her repeated use of staff time to air personal grievances unrelated to City business;[94] and her refusal to follow Council Rules governing interactions with staff and the use of City resources.[95] Those concerns would have existed regardless of whether Dennis had a disability. Nothing in the record suggests that the City implemented the restrictions because of ADHD or that another Council Member engaging in the same conduct would have been treated differently.

---

[93] *See* Zelms Decl. ¶ 10; Norton Decl. ¶ 6; *see generally* Dennis Dep. Tr. Vol. II 13:02–16:23, 91:13–115:13.

[94] *See* Zelms Decl. ¶ 5; Norton Decl. ¶ 5; *see generally* Exhibit 20 (exemplar email).

[95] *See* Zelms Decl. ¶¶ 6–8; Exhibit 16.

Indeed, the record points in the opposite direction. While enforcing these restrictions, the City simultaneously engaged in the interactive process, reviewed medical documentation, considered accommodation requests, and implemented accommodations designed to address Dennis's documented limitations. That conduct is inconsistent with any inference of disability-based animus.

Dennis offers no direct evidence linking her disability to the challenged decisions, nor does she offer circumstantial evidence from which a reasonable jury could infer discriminatory intent. Instead, she relies on her own belief that the City's actions were motivated by disability discrimination. But a plaintiff's subjective speculation does not create a genuine issue of material fact. *See, e.g.*, *Nelson v. Am. Modern Ins. Grp., Inc.*, Case No. 23-cv-525 (LMP/JFD), 2025 WL 918528, at *4 (D. Minn. Mar. 26, 2025). Dennis cannot show that she was excluded from a public service, program, or activity, and she cannot show that any challenged action was taken because of her disability.

The undisputed evidence shows that the City responded to conduct and governance concerns while simultaneously accommodating her disability. No reasonable jury could find intentional discrimination on this record.

## II. Dennis's reprisal claim also fails.

Dennis's separate reprisal claim under the MHRA fares no better. Minnesota Statute § 363A.15 protects against reprisals for a person who opposes a practice forbidden by the MHRA, files a charge, or participates in an investigation related to

such a practice. *See* Minn. Stat. § 363A.15. To demonstrate reprisal, Dennis must show (1) she engaged in protected activity; (2) Defendants took an adverse action against her; and (3) a causal connection between the two. *See Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1115 (8th Cir. 2023). For purposes of this motion, Defendants do not dispute that Dennis engaged in protected activity by complaining about alleged discrimination, *see Wilson v. Ark. Dep't of Hum. Servs*., 850 F.3d 368, 372 (8th Cir. 2017) (complaining about discrimination constitutes protected activity), but Dennis cannot establish either a materially adverse action or the required causal connection as to the City or Mayor Norton. The reprisal claim also separately fails because immunity bars it.

**1. Dennis cannot establish materially adverse action.**

Dennis claims that after she reported the City's discrimination, City officials engaged in a broad campaign of retaliation designed to restrict her access to information and resources, damage her reputation, and diminish her standing with colleagues and constituents.[96] Many of those allegations do not amount to adverse actions as a matter of law.

To begin, many of the actions Dennis challenges are not materially adverse reprisals but instead ordinary operational decisions or attorney-client boundary-setting measures. Dennis contends that the City retaliated against her through

[96] Exhibit 17 (Response to Interrogatory No. 6).

denying her the ability to participate in multiple police ride-alongs, relocating her office, restructuring meetings, and the like.[97] But none of those decisions deprived Dennis of any right, entitlement, or tangible benefit. The text of Minn. Stat. § 363A.15—which defines reprisal to include "intimidation, retaliation, or harassment"—reflects that the MHRA targets significant adverse consequences rather than ordinary workplace friction or perceived unfairness. Ordinary political disagreement and discretionary decisions in public service do not constitute reprisal. *See Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 754 (8th Cir. 2000) (no adverse action where a city denied a voluntary, discretionary option that was neither an entitlement nor a benefit).[98] And exclusion from voluntary meetings, standing alone, does not result in the kind of concrete injury necessary to support a discrimination or reprisal claim. *See Johnson v. SICO America, Inc.*, A21-0101, 2021 WL 4145019, at *5 (Minn. App. Sept. 13, 2021) (MHRA reprisal claim failed because employee's relocation, exclusion from gatherings, and reduced workload did not constitute an adverse employment action where her pay and hours were unchanged); *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007) (exclusion from meetings did not amount to retaliation under Title VII). Instead, an

---

[97] *Id.*

[98] In construing the MHRA, Minnesota courts apply law developed in cases arising under federal law. *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999).

action is materially adverse only if it produces an injury or harm that might dissuade a reasonable person from raising legitimate complaints through proper channels. *Trambly v. Bd. of Regents of Univ. of Neb.*, 145 F.4th 922, 928 (8th Cir. 2025). The routine operational decisions Dennis identifies do not meet that standard.

The same is true of Dennis's more specific accusations directed at the City Attorney. Even putting aside the fact that many of those allegations are unsupported by the record, the conduct she identifies did not result in any cognizable harm or constitute materially adverse action. Spindler-Krage's involvement in the Council's decision to censure Dennis was part of his role as legal advisor to the City, not an adverse action. He reviewed Dennis's family-court records only after Dennis herself accused the City of harming her children, and he did not publicly disclose those records, which were themselves public.[99] Likewise, the requirement that Dennis submit questions in writing was a professional boundary he imposed after months of contentious and repetitive communications.[100] It did not prevent Dennis from seeking legal advice or from raising concerns about discrimination, accommodation, or retaliation. Indeed, Dennis continued to complain about discrimination, failure to accommodate, and retaliation throughout the remainder of her Council tenure.

---

[99] *See* Exhibit 14. Dennis herself later forwarded the email to the press. *See* Exhibit 15.

[100] *See* Spindler-Krage Decl. ¶ 3; Exhibit 20 (example of contentious communication); Exhibit 21 (describing process for submitting legal questions about City business).

The undisputed record therefore shows that the City Attorney's actions neither would have dissuaded, nor in fact did dissuade, Dennis from engaging in protected activity. Accordingly, those actions cannot support a reprisal claim as a matter of law.

Likewise, many of Dennis's allegations rest entirely on Dennis's suspicions, assumptions, and hearsay. For example, Dennis claims that Zelms offered to support Dennis's opponent in his election bid; Zelms and Norton made false statements to the independent investigator; and Norton spoke poorly and spread "lies" about her to the press and community organizations, which caused third parties to view her less favorably.[101] Those amount to workplace rumors, and courts routinely hold that workplace rumors, criticism, and similar interpersonal disputes are not materially adverse because they would not dissuade a reasonable person from exercising statutory rights. *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019) (rumors are "petty slights [and] minor annoyances" that are not actionable retaliation).

Moreover, Dennis offers no admissible evidence of the alleged statements, let alone any resulting harm.[102] Such speculation cannot defeat summary judgment. A

[101] Exhibit 17 (Response to Interrogatory No. 6); *see also* Dennis Dep. Tr. Vol. II 33:08–36:09; 46:20–48:14; 103:23–04:15.

[102] *See, e.g.*, Dennis Dep. Tr. Vol. II at 34:03–38:22; 41:17–60:09 (describing speculative and hearsay evidence of retaliatory acts).

plaintiff may not create a genuine dispute of material fact through conjecture, lack of recollection, or unsupported assumptions. *See Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010) ("[Plaintiff's] unsupported, self-serving allegations and denials are insufficient to create a genuine issue of material fact."); *To v. U.S. Bancorp*, 651 F.3d 888, 892 n.2 (8th Cir. 2011) ("An assertion that a party does not recall an event does not itself create a question of material fact about whether an event did, in fact, occur."), *cf.*, *Merechka v. Vigilant Ins. Co.*, 26 F.4th 776, 783 (8th Cir. 2022) (concluding that plaintiff's memory issues did not preclude summary judgment). In short, Dennis offers no admissible evidence to support her allegations, and even if she did, the conduct she describes amounts to interpersonal friction, criticism, and changes to voluntary working arrangements, not actionable discrimination or reprisal. No reasonable jury could conclude otherwise.

**B. Dennis cannot establish causation.**

Her retaliation claim also fails for lack of causation. To establish retaliation, Dennis must show a causal connection between her protected complaints of discrimination and the challenged actions. She cannot do so here.

First, the chronology does not support Dennis's retaliation theory. To establish causation through temporal proximity alone, the protected activity and the challenged action must occur "very close" in time; gaps of more than two months generally require additional evidence of retaliatory motive. *See Sisk v. Picture People, Inc.*, 669 F.3d 896, 900–01 (8th Cir. 2012). Here, Dennis began making complaints

that qualify as protected activity no later than July 2022.[103] She continued making discrimination complaints thereafter, and her allegations became particularly pronounced following the March 2023 censure, prompting the City to retain an independent investigator to evaluate her claims.[104] Yet many of the actions Dennis now characterizes as retaliatory occurred many months, and in some instances more than a year, after she first engaged in protected activity. For example, Dennis identifies as retaliatory a December 26, 2023 email from City Administrator Zelms that reiterated communication boundaries and existing limitations on staff time, consistent with the Council Rules.[105] That communication was sent more than a year after Dennis first reported discrimination and approximately nine months after the City had already engaged an outside investigator to review her concerns.[106] Such a temporal gap is far too attenuated to support an inference of causation by itself. *Sisk*, 669 F.3d at 900–01. Accordingly, Dennis must identify additional evidence showing that the challenged actions were motivated by retaliatory animus. She cannot do so. The record contains no evidence linking the December 2023 communication, or many of the other actions she challenges, to her protected

[103] *See* Zelms Decl. ¶ 6; Norton Decl. ¶ 3; Spindler-Krage Decl. ¶ 3; Exhibit 4.

[104] *See* Exhibit 10.

[105] *See* Exhibit 17 (Response to Interrogatory No. 6).

[106] *See* Exhibit 16.

activity, rather than to the ongoing governance and interpersonal disputes that characterized her tenure on the Council.

Second, the undisputed record shows that the challenged actions followed intervening conduct-based events, not protected activity. For example, Mayor Norton imposed conditions on future meetings only after learning that Dennis had secretly recorded their conversations and distributed those recordings to the media.[107] Because Dennis refused to stop recording, the meetings ceased.[108] Likewise, the restrictions governing Dennis's interactions with staff arose from concerns regarding her repeated disputes with staff, use of staff time, failure to follow Council Rules, and other governance-related issues.[109] And each of those actions occurred months after Dennis sought an accommodation and first alleged discrimination and retaliation.

Dennis therefore cannot establish the required causal connection between her protected activity and the challenged actions. The evidence demonstrates that both the City's and Norton's decisions were prompted by concerns about trust, confidentiality, and the effective functioning of City government—not by Dennis's requests for accommodation or complaints of discrimination or retaliation.

---

[107] Norton Decl. ¶ 7.

[108] *Id.*

[109] Zelms Decl. ¶¶ 6–9; *see also* Exhibit 16.

### C. Dennis's individual liability claim against Norton independently fails because Norton is protected by immunity for discretionary governmental judgments.

Dennis's individual-capacity claim against Mayor Norton fails for an additional reason: the challenged conduct consists of discretionary governmental decisions protected by official immunity. Under Minnesota law, public officials are immune from liability for discretionary acts unless they act willfully or maliciously. *Rico v. State*, 472 N.W.2d 100, 106–07 (Minn. 1991). To overcome official immunity, Dennis must show that Norton intentionally violated a clearly established or known right. *See Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 465 (Minn. 2014) (defining malice as "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.").

Dennis has no such evidence. At bottom, she challenges Norton's management of interactions and communications with a colleague—Dennis—who had repeatedly and surreptitiously recorded conversations with City officials. In responding to that situation, Norton had to balance competing governmental, political, and operational interests, which are quintessential discretionary judgments entitled to official immunity. *Davis v. Hennepin Cnty.*, 559 N.W.2d 117, 121 (Minn. App. 1997) (official immunity protects government officials' broad discretion to conduct business and make decisions), *rev. denied* (Minn. May 20, 1997). Nothing in the record suggests that Norton acted maliciously or intentionally violated Dennis's clearly established legal right.

The same result follows under statutory discretionary immunity. The City, like all Minnesota municipalities, is immune from claims based on the performance of discretionary functions involving policy-level decision-making. Minn. Stat. § 466.03, subd. 6. Decisions regarding whether, when, and under what circumstances the Mayor would meet individually with a Council Member implicated considerations of governance, workplace functioning, and the effective operation of City government. Because those decisions involved the exercise of governmental discretion, they are protected from judicial second-guessing. Accordingly, both official immunity and statutory discretionary immunity bar Dennis's claim against Mayor Norton.

## III. Even if Dennis could prove liability, many categories of damages she seeks are unavailable as a matter of law.

Even if Dennis could establish liability, her requested damages would be limited as a matter of law. Dennis's remaining damages theories fail because they depend on speculation about future employment and election results. The law does not permit recovery for damages that require the Court or a jury to guess what career opportunities Dennis might have obtained or how voters would have acted absent the challenged conduct.

### A. Dennis cannot recover compensatory damages under the ADA because she cannot demonstrate deliberate indifference.

Dennis's claim for compensatory damages under the ADA fails because she cannot show that Defendants acted with deliberate indifference. A plaintiff seeking

compensatory damages under the ADA must prove that the defendant was deliberately indifferent to her federally protected rights. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (discussing requirement under the ADA). Deliberate indifference may be inferred where a defendant consciously disregards a strong likelihood that its policies or conduct will violate those rights. *Id.* Here, the City's response was not indifferent. It (1) readily agreed to accommodate Dennis's documented ADHD-related needs when she disclosed her condition; (2) engaged in the interactive process each time she submitted new requests; (3) provided substantial physical and logistical accommodations, including a standing desk, podium platform, physical document copies, printer cartridges, and phone livestream access; (4) commissioned an independent investigation into Dennis's discrimination complaints; and (5) limited Dennis's communications only after her documented conduct repeatedly violated the Council Rules and disrupted City operations. Those limits tracked the Council Rules governing all Members and responded narrowly to documented misconduct. Given the constitutional and statutory support for a City Council to govern itself, Dennis cannot show deliberate indifference.

### B. Damages tied to a lost election and inability to gain other employment are speculative and unrecoverable.

Dennis seeks $75,000 annually in perpetuity based on the theory that Defendants' alleged conduct caused both her defeat in the 2024 City Council

election and her subsequent inability to secure comparable employment. Neither theory supports a recoverable damages claim. As to the election, any claim for lost earnings from the Council seat rests on pure speculation because it requires conjecture about how thousands of Ward 6 voters would have voted absent the challenged conduct. See *Pavek v. Simon*, 467 F. Supp. 3d 718, 752 (D. Minn. 2020) (loss of an election is not compensable through an award of damages); *Carmody v. Kan. City Bd. of Police Comm'rs*, 713 F.3d 401, 407 (8th Cir. 2013) ("unsupported estimations" are insufficient to prove damages). A jury could only reach such an award by speculating about voter motivations, the factors that influenced the election, and whether any alleged conduct by the City affected the outcome. The law does not permit damages based on such guesswork.

Dennis's claim for post-Council lost earning capacity fares no better. In *Bartlett v. New York State Board of Law Examiners*, the court rejected a claim for lost salary and benefits because it depended on "the inherent speculation of predicting what one's career might have become." 970 F. Supp. 1094, 1152 (S.D.N.Y. 1997), *aff'd in part and vacated in part on other grounds*, 226 F.3d 69 (2d Cir. 2000). The same is true here. Dennis has identified no prospective employer that declined to hire her because of anything City officials said or did, much less evidence permitting a jury to quantify resulting losses. Her theory depends on a chain of unsupported assumptions and speculation about what prospective employers knew, how they

perceived her, whether they were influenced by the alleged conduct, and whether they otherwise would have offered her employment. Because those claimed losses are inherently speculative and cannot be proven with reasonable certainty, her claims for lost Council earnings, future lost income, and diminished earning capacity fail as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants City of Rochester and Kim Norton respectfully request that the Court grant Defendants' Motion for Summary Judgment.

Dated: September 3, 2026

**GREENE ESPEL PLLP**

*s/ Jenny Gassman-Pines*

Jenny Gassman-Pines, Reg. No. 0386511
Erin Emory, Reg. No. 0401215
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
jgassman-pines@greeneespel.com
eemory@greeneespel.com
(612) 373-0830

Attorneys for Defendants