**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| **Molly L. Dennis,**<br><br>Plaintiff,<br><br>v.<br><br>City of Rochester, and Kim Norton, in her individual as well as official capacity as the mayor of the City of Rochester,<br><br>Defendants. | **Case No. 0:24-cv-00426 (PJS/DLM)**<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

This case follows a familiar pattern: a person whose mind works differently is called difficult, then ostracized, then punished for the very traits she cannot change. When the government doing the punishing is bound by the Americans with Disabilities Act and the Minnesota Human Rights Act, that pattern is unlawful.

Molly Dennis served as an elected Rochester City Council member from 2021 until her term ended in January 2025, and she has a diagnosed neurodevelopmental disability. She asked to serve on equal footing with her colleagues. Instead, the City questioned whether her disability was real, singled her out with a behavior policy no other member faced, censured her with restrictions that cut against the accommodations it had promised, and reached into her private family-court file to circulate judicial findings that her conduct was not caused by her disability. Her treating clinician, who unlike the City's retained expert actually treated her, opines that the City's restrictions denied her meaningful access rather than accommodating her disability. (Pl. Ex. 7.)

The City moves for summary judgment by insisting that the record is undisputed and that everything it did was a neutral response to conduct rather than to disability. The record is not undisputed, and the City's own documents contradict its story. Whether the City acted because of Ms. Dennis's disability, and whether it afforded her meaningful access, are questions for a jury.

Three claims remain: an ADA denial-of-public-services claim (Count 1) and an MHRA denial-of-public-services claim (Count 3) against the City, and an MHRA reprisal claim (Count 4) against the City and Mayor Norton. The City moves on six grounds, and this memorandum answers them in the order the City raised them. First, the City says the disability statutes do not reach an elected official; but this Court already held that they do, and no decision of this Circuit adopts the categorical exclusion. Second, it says it provided meaningful access as a matter of law; but the City's own standard makes that a fact question, and its retained expert squarely conflicts with Ms. Dennis's treating clinician. Third, it says there is no evidence it acted because of disability; but its lawyer branded her documented disability as "claimed" and circulated family-court findings rejecting the disability explanation. Fourth, it says the reprisal claim fails; but the City applies the wrong legal standard, and the documented restrictions could dissuade a reasonable official from complaining. Fifth, it claims immunity; but immunity turns on motive, which is disputed. Sixth, it attacks damages; but the recoverable categories present fact questions of indifference and causation. None can be resolved as a matter of law.

## PROCEDURAL POSTURE AND THE CLAIMS AT ISSUE

This motion addresses a narrowed case. Ms. Dennis's operative pleading is her First Amended Complaint. ECF No. 13. On the City's motion to dismiss, the Court dismissed most of her claims and allowed three to proceed: her ADA denial-of-public-services claim (Count 1) against the City; her MHRA denial-of-public-services claim (Count 3) against the City; and her MHRA reprisal claim (Count 4) against the City and Mayor Norton. *Dennis v. City of Rochester*, 2024 WL 5508592 (D. Minn. Oct. 30, 2024), adopted, 2025 WL 758634 (D. Minn. Mar. 11, 2025). The Court later denied leave to amend. Those three claims frame this motion. As the Court explained, the public-services claims in Counts 1 and 3 encompass "both disparate treatment because of a disability and failure to provide reasonable accommodations." 2025 WL 758634, at *2.

One matter of scope follows. To the extent Ms. Dennis's claims rest on the individual members' legislative act of voting to adopt the censure, the Court dismissed those claims against the individuals on absolute legislative immunity. *See* 2024 WL 5508592, at *4-*6. That ruling is limited to the vote itself. It does not reach the City, and it does not immunize the censure's operative restrictions or the City's enforcement of them, which are administrative in nature and remain fully actionable.

## COUNTERSTATEMENT OF MATERIAL FACTS

Plaintiff sets out below the material facts in genuine dispute. They fall into two groups: the City's non-legislative conduct targeting Ms. Dennis's disability, which is the basis of her claims, and the censure and its assembled justifications, which are evidence of

the motive behind that conduct. The record citations are to the exhibits identified in Plaintiff's Exhibit List, filed herewith.

The genuine disputes of material fact include: (1) whether the City's interactive process was prompt and adequate, or instead stalled, was declared closed, and reopened nearly a year later; (2) whether the accommodations afforded meaningful access, on which the treating clinician and the City's retained expert directly conflict; (3) whether the City Attorney's "claimed disability" emails reflect disability animus; (4) whether the "Censure Examples" memo, compiled two weeks after the vote, shows the stated reasons were assembled after the fact; (5) whether the City Attorney's search and circulation of Ms. Dennis's family-court file reflect animus and retaliation or the benign "boundary-setting" the City asserts; (6) whether the disability-specific behavior policy singled Ms. Dennis out; and (7) whether the censure's communication restrictions and the later limits on her access to staff and information denied her meaningful access and would dissuade a reasonable official from complaining. The following facts, and the reasonable inferences a jury could draw from them, frame those disputes.

**A. Ms. Dennis's Disability and Her Disclosures to the City.**

Ms. Dennis has attention-deficit/hyperactivity disorder and was later diagnosed with autism spectrum disorder. Her disability affects how she communicates and processes information: she "process[es] best verbally," and "[e]mailing is very difficult" for her. (Pl. Ex. 12.) She disclosed her disability to the City and supported it with documentation from her Mayo Clinic providers, including letters dated April 20, 2021, August 31, 2022, and June 1, 2023, which are identified among the materials Ms. Dennis's treating clinician

reviewed. (Pl. Ex. 7, Ex. B (materials considered).) The City does not dispute that she has a disability; its motion distinguishes between her "disability" and the "conduct" for which it disciplined her. *See* Defs.' Mem. 29-32.

**B. The City Questioned the Legitimacy of Ms. Dennis's Disability.**

Beginning in the summer of 2022, the City Attorney repeatedly characterized that documented disability as merely "claimed" and pressed Ms. Dennis to prove it, writing on August 19, 2022 that her physician's letter "does not include an explicit diagnosis." (Pl. Ex. 1.) Ms. Dennis responded on September 1, 2022 that she was "deeply saddened" to "go through such great lengths to prove to the City attorney that their medical disability is legitimate," and that his "repeatedly using the words 'claimed disability'" caused her trauma. (Pl. Ex. 1.) The City Attorney confirmed that he had "reviewed" her medical accommodation letter and deemed it "relevant to your ongoing claims re disability/conduct," tying the medical documentation to the conduct for which she was later disciplined. (Pl. Ex. 1.)

**C. The Accommodation-Request Sequence.**

The interactive process was neither prompt nor stable. Ms. Dennis first disclosed her disability and sought accommodations in 2021. During the summer of 2022, while the City questioned the legitimacy of her disability, the parties met on July 20, 2022, after which the City gave her written "parameters" for her conduct; Ms. Dennis disputes the "threatening" account of that meeting, explaining that she "was never volatile or physically agitated" and that there "was never basis for me being perceived as 'threatening' at all."

(Pl. Ex. 2.) By late October 2022 the process had stalled, with Ms. Dennis reporting that she "hadn't heard anything in a month." (Pl. Ex. 5.)

On December 20 and 21, 2022, the City's human-resources director transmitted a letter stating that the City, through outside counsel Susan Hansen, had "conclude[d]" the interactive process, and enumerating the accommodations it would provide: movement breaks every 90 to 120 minutes called by the Presiding Officer, a standing-desk platform, a clipboard, a mobile desk on wheels with a handheld microphone, and printer cartridges so she could print materials she needed. (Pl. Exs. 4, 11.) The process did not stay concluded. Ms. Dennis continued to submit medical documentation, including a June 1, 2023 Mayo Clinic letter (Pl. Ex. 7, Ex. B (materials considered)), and on October 12, 2023, more than ten months after the process was declared complete, the City issued an "updated" letter "to facilitate access to public services based on the most recent medical documentation" she had submitted. (Pl. Ex. 6.) Ms. Dennis's treating clinician opines that the accommodations the City offered did not afford her meaningful access to participate in Council proceedings (Pl. Ex. 7); the City's retained expert opines otherwise (Pl. Ex. 8).

**D. A Disability-Specific Behavior Policy Targeted Ms. Dennis Alone.**

During the same period the City developed a "behavior policy" aimed at communication and processing traits associated with Ms. Dennis's disability. She objected that "there are no other neuro-typical councilmember who have been giv[en] a 'behavior policy' against them," and that members "far more disruptive and aggressive in council meetings" were "not been targeted by the City with disciplinary actions or behavior policy." (Pl. Ex. 1.)

**E. The Censure and Its Exact Terms.**

On March 6, 2023, in the middle of this ongoing accommodation process, the Council adopted a resolution censuring Ms. Dennis. The censure did not merely express disapproval; it imposed operative restrictions on how she could carry out her office. Its terms directed, among other things, that "Councilmember Dennis shall limit her staff meetings and communications to Department Heads, the City Administrator, and the City Attorney, and such meetings shall be for information related to City business." (Pl. Ex. 11.) The City Attorney, whose role it was to "interpret the Censure," summarized its operative terms in writing: Ms. Dennis could hold "[o]nly virtual meetings with City staff for the remainder of 2023"; her "staff meetings or other communications [were] limited to Dept. Heads, the City Administrator and City Attorney"; she could speak to staff only "at a publicly noticed meeting[]" or "at other public events"; and "[a]ll written communication to City staff shall be copied to the City Administrator." (Pl. Ex. 11.)

The written justification came later. The document setting out the "specific examples" said to support the censure is dated March 20, 2023, two weeks after the censure was imposed, and when Ms. Dennis asked for the basis of the four concerns recited in the resolution, none was provided at the time of the vote. (Pl. Exs. 3, 11.) A jury could find the stated reasons were assembled after the fact to support a decision already made.

**F. The Censure Countermanded Ms. Dennis's Accommodations.**

The censure's directives cut directly against the accommodations Ms. Dennis needed and had been promised. They restricted her staff meetings to virtual meetings for the remainder of 2023, limited the staff with whom she could communicate, and required

that her written communications to staff be copied to the City Administrator, precisely when her disability meant she "process[es] best verbally" and found "[e]mailing … very difficult," and when direct access to City staff and information was central to the access she sought. (Pl. Exs. 7, 11, 12.) Her treating clinician opines that these communication restrictions were incompatible with Ms. Dennis's disability-related needs rather than an accommodation of them. (Pl. Ex. 7.) A reasonable jury could find that the censure operationalized the denial of Ms. Dennis's accommodations rather than accommodating her.

### G. The City Attorney Searched Ms. Dennis's Family-Court File and Circulated it to City Leadership to Attack her Disability and Her Parenting.

On the morning of March 20, 2023, the same day the City compiled its censure "examples," City Attorney Michael Spindler-Krage sent an email captioned "your children" to the City Administrator, two Deputy City Administrators, and the Council President. (Pl. Ex. 9.) Though addressed "Good morning CM Dennis," it was sent only to the City Administrator, two Deputy City Administrators, and the Council President, not to Ms. Dennis. (Pl. Ex. 9.) The email told her to "discontinue the inflammatory claims that the City is harming your children," called her advocacy "cruel and harmful to your children," and urged her to "discuss this with your therapist or someone else close to you." (Pl. Ex. 9.)

The email then reached into Ms. Dennis's private divorce proceeding. It stated that her conduct was "sadly similar to your divorce circumstances, only nine months ago, where a judge publicly admonished you for involving your children in the divorce conflict," and

it quoted at length from the family-court order, including the court's findings that it did "not find Mother credible that her outbursts are solely related to her ADHD diagnosis," that "Mother can control her outbursts and behave appropriately in other settings," and that the court was "very concerned that Mother is not addressing her issues and learning sufficient coping skills." (Pl. Ex. 9.) The City Attorney, a trained prosecutor who advised on the censure and the behavior policy, thus retrieved Ms. Dennis's family-court records and selected, for circulation to the City's decisionmakers, the precise judicial language discounting the link between her conduct and her disability.

This was not incidental. The City's own "Censure Examples" document, dated the same day, lists among the grounds for censure that Ms. Dennis sought assistance "on personal matters, including her divorce, her response to a harassment restraining order," and other personal matters. (Pl. Ex. 3.) Ms. Dennis contemporaneously described the City Attorney as having "spent countless hours snooping into my personal family files," and going "line-by-line in my personal family court files to pick out phrases to email to head city staff." (Pl. Exs. 9, 10.) Whether the City Attorney's search of a sitting Council member's family-court file and his circulation to City leadership of findings questioning her disability and her fitness as a mother reflect disability animus and retaliation, or the benign "boundary-setting" the City now claims, is a question for the jury.

### H. The City Further Restricted Ms. Dennis's Access to Staff, Information, and the Functions of Her Office.

The censure's communication restrictions did not stand alone. The City required Ms. Dennis to route requests through department heads and to follow steps to obtain

information that other Council members did not face, included supervisors on her communications, relocated her office, restructured her meetings, and suspended her participation in police ride-alongs. *See* Defs.' Mem. 33-34 (cataloging these actions). Ms. Dennis contemporaneously described being "systematically denied meetings with the City Attorney, the Mayor, and … the City Administrator," being "force[d] to jump through condescending hoops to access basic information," and being "denied to use email as correspondence" with City staff "per Spindler-Krage's orders," and required to route her requests through prescribed channels instead. (Pl. Ex. 13.) Whether these measures were, as the City contends, ordinary operational decisions, or instead a course of conduct that denied Ms. Dennis meaningful access to the functions of her office and answered her complaints of discrimination with restriction, is disputed and for the jury.

## ARGUMENT

**The record permits competing inferences, which forecloses summary judgment.**

Summary judgment is available only where "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and the Court views the evidence in the light most favorable to Ms. Dennis, drawing all reasonable inferences in her favor. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The Court "may not make credibility determinations or weigh the evidence," because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As Judge Schiltz has explained, the movant must show the absence of a genuine dispute, and the Court draws "all justifiable inferences" for the nonmovant. *Kapps v.*

*Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1145 (D. Minn. 2011) (Schiltz, J.). The ADA and MHRA claims are analyzed under the same framework. *See* Defs.' Mem. 19.

## I. TITLE II AND THE MHRA REACH THE CITY'S DENIAL OF ACCESS TO THE FUNCTIONS OF MS. DENNIS'S OFFICE

Plaintiff's position is straightforward: Title II and the MHRA protect a disabled elected official's equal access to the functions of her office, and this Court has already held that neither statute excludes elected officials from such a claim.

The City argues the opposite as its threshold point. It contends that the statutes do not apply to Ms. Dennis at all because she was an elected official "on the governmental side," not a member of the public receiving a service; that "services, programs, or activities" means only public-facing governmental outputs and not the "internal operations" of government; and that everything Ms. Dennis complains of is internal governance, so that she is even further removed from a service recipient than the public employees in its lead cases. Defs.' Mem. 18-22 (relying on *Zimmerman* and *Brumfield*). The City frames the whole suit as an attempt to convert "disputes over Council governance, meeting procedures, and political consequences" into discrimination claims. Defs.' Mem. 1.

The City is wrong on the law, the text, and the record. This Court has already declined to adopt the categorical exclusion; the statutory text contains no such exception; the most analogous authority is squarely contrary; and the City's own cases do not support it.

One boundary is worth stating at the outset. The Court dismissed Ms. Dennis's claims against the individual members to the extent those claims rest on the legislative act of voting to adopt the censure. *Dennis*, 2024 WL 5508592, at *4-*6. That ruling leaves the City fully answerable for what remains: the operative restrictions the censure imposed, their enforcement, the interactive process, the staff-access rules, and the City Attorney's extra-legislative conduct, all of which are administrative rather than legislative. And the censure's operative terms were restrictions, not mere expression. The City Attorney, whose role was to interpret the censure, summarized its terms in writing to direct that Ms. Dennis could hold "[o]nly virtual meetings with City staff for the remainder of 2023," that her "staff meetings or other communications [were] limited to Dept. Heads, the City Administrator and City Attorney," and that "[a]ll written communication to City staff shall be copied to the City Administrator." (Pl. Ex. 11.)

### A. The Court has Already Rejected the Categorical Exclusion the City Renews.

The City made this same argument at the pleading stage, that an elected official stands on the government's side of the line and cannot bring a public-access claim. The Court disagreed. It held that "[n]either the ADA nor the MHRA expressly exclude elected officials from bringing a public access claim related to their disability," and it declined to "draw any legal distinction between who is a member of the public ... and who is not." *Dennis v. City of Rochester*, 2024 WL 5508592, at *10 (D. Minn. Oct. 30, 2024) (Micko, M.J.), R&R adopted in relevant part, 2025 WL 758634 (D. Minn. Mar. 11, 2025) (Schiltz, J.). The Court construed Ms. Dennis's claim to allege that "she was excluded from

receiving the benefits of, and participating in, the City's services and activities available to non-disabled members in her elected councilor peer group." *Id.* The summary-judgment record supplies no basis to adopt now the categorical rule the Court already declined to adopt; discovery has instead confirmed the factual premise of the claim.

**B. Title II's text is Broad, and Access to the Democratic Process Lies at its Core.**

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The Supreme Court reads that language broadly and without implied exceptions. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-12 (1998). As this Court put it, quoting settled authority, "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Dennis*, 2024 WL 5508592, at *10 (quoting *Bahl v. County of Ramsey*, 597 F. Supp. 2d 981, 985 (D. Minn. 2009), in turn quoting *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998)). Access to the governmental process is not some lesser activity outside the statute; courts have treated access to legislative proceedings as a public service within Title II. *See Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763 (11th Cir. 2020) (allowing a Title II claim for meaningful access to state legislative proceedings to proceed over the State's sovereign-immunity defense). Title II reaches access to the core functions of government, *Tenn. v. Lane*, 541 U.S. 509, 531 (2004), and it imposes on public entities "an affirmative obligation to make reasonable accommodations for disabled individuals," not merely a

duty to refrain from animus, *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454-55 (5th Cir. 2005).

### C. The Most Analogous Authority Holds that Elected Officials may Invoke Title II.

No decision of the Eighth Circuit adopts the categorical exclusion the City urges, and the closest authority applies Title II to elected officials performing the functions of their offices. The two decisions that follow are from other courts and do not bind this Court, but each applied Title II to an elected official seeking to perform the functions of the body to which she was elected, and their reasoning maps directly onto Ms. Dennis's claim. *Silver v. City of Alexandria* is nearly this case: a sitting city council member with a serious cardiac condition sought to participate in council meetings remotely, and the City argued, as it does here, that the ADA did not apply because he was an elected official rather than an employee. 470 F. Supp. 3d 616, 620-25 (W.D. La. 2020). On the plaintiff's motion for a preliminary injunction, the court disagreed and granted relief, holding that "both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals," *id.* at 621, that remote participation "would not alter the nature of City Council meetings," and that "[w]ithout injunctive relief, Mr. Silver has no means of attending City Council meetings in any capacity," *id.* at 623-24. The court found that "the sole cause of the Defendant's refusal to allow his virtual participation was Mr. Silver's serious medical conditions," *id.* at 622, and ordered the City to allow him "to participate and vote in all regular or special Alexandria City Council meetings virtually," *id.* at 625.

*Hernandez v. Enfield Bd. of Educ.*, from the District of Connecticut, confirms the point through a jury verdict and a post-verdict injunction. An autistic and hearing-impaired member elected to a board of education sought accommodations to communicate at meetings; the jury found that the defendants "excluded Hernandez from equal participation in their services, programs, or activities" and "denied her equal access to the benefits" of those activities, in violation of Title II and Section 504. 2024 WL 3011177, at *1 (D. Conn. June 14, 2024). After the verdict, the court entered a permanent injunction requiring the defendants to adopt a policy "for qualified individuals with disabilities, including candidates and elected officials, to request and obtain auxiliary aids and services and reasonable modifications," explaining that the relief was necessary to ensure "that individuals with disabilities have an equal opportunity to participate in local office once elected." *Id.* at *4-*5. It is difficult to reconcile the City's categorical theory with a verdict and injunction that expressly protect elected officials in the performance of their offices.

### D. The City's Authorities Do Not Establish an Elected-Official Exclusion.

The City's cases do not supply the rule it needs. *Zimmerman v. Oregon Dep't of Justice* and *Brumfield v. City of Chicago* are employment cases holding only that a public employee cannot use Title II to reshape the terms of a job. 170 F.3d 1169, 1174 (9th Cir. 1999); 735 F.3d 619, 628 (7th Cir. 2013); *see* Defs.' Mem. 20-21. This Court has already held that Ms. Dennis was not an employee. *Dennis*, 2024 WL 5508592, at *6-*9. The legislative-immunity cases fare no better, because none holds that an elected official is outside Title II. *Cushing v. Packard* resolved the appeal on legislative immunity and disclaimed any ruling on coverage: its task was not "to decide how the ADA's and the

RHA's requirements to provide reasonable accommodations to those with medical vulnerabilities apply," but was "solely to determine whether the District Court erred in holding that the Speaker's assertion of legislative immunity prevents the plaintiffs from obtaining" relief. 30 F.4th 27, 31-32 (1st Cir. 2022) (en banc). *Chew* denied a temporary restraining order on the heightened preliminary-relief standard while recognizing that "[t]he failure to provide [a] reasonable accommodation can constitute discrimination," that the reasonableness inquiry "requires a fact-specific, individualized analysis," and that "at first glance, in this modern age of technology, it appears reasonable to request to participate in the legislative session remotely," noting that the plaintiffs "may ultimately prevail upon a full adjudication of the merits." *Chew v. Legislature of Idaho*, 512 F. Supp. 3d 1124, 1128-30 (D. Idaho 2021). *Selene* likewise denied only preliminary relief while holding that disabled members of the public and disability-rights organizations seeking access to legislative proceedings had standing, that legislative immunity did not preclude their suit because the challenged accommodation decisions were administrative rather than legislative, and that their request to access a public service under Title II of the ADA was cognizable. *Selene v. Legislature of Idaho*, 514 F. Supp. 3d 1243, 1249-50 (D. Idaho 2021). And this Court has already distinguished *Chew* because it "opines not on a motion to dismiss, but on a motion for a temporary restraining order," which the Court described as "a distinct mechanism for relief with a different standard of review." *Dennis*, 2024 WL 5508592, at *11.

### E. The MHRA Independently Protects Ms. Dennis's Access to and Full Utilization of City Services

The MHRA independently protects Ms. Dennis under its own, particularly broad statutory text. Section 363A.12 makes it "an unfair discriminatory practice to discriminate against any person in the access to, admission to, full utilization of or benefit from any public service" because of disability. Minn. Stat. § 363A.12, subd. 1. The statutory definition of "public service" reinforces the point. The MHRA does not define the term as a service government renders to an outside customer; it defines it institutionally, to include "any public facility, department, agency, board or commission, owned, operated or managed by or on behalf of the state of Minnesota, or any subdivision thereof, including any county [or] city." Minn. Stat. § 363A.03, subd. 35. The City's distinction between public-facing outputs and internal operations thus finds no footing in the statute.

Nor does the statute condition that protection on Ms. Dennis being an employee or an ordinary member of the public. As shown above, this Court has already rejected that very limitation under both statutes: it held that neither the ADA nor the MHRA excludes an elected official from a public-access claim related to her disability, and it declined to draw the City's proposed line between an elected official and a member of the public. *Dennis*, 2024 WL 5508592, at *10 (quoted supra Part I.A). On that basis the Court allowed Ms. Dennis's MHRA denial-of-public-services claim to proceed against the City. *Id.* at *10-*12.

That Ms. Dennis is not the City's employee does not narrow this protection; it channels her claim to the correct provision. The MHRA's employment provisions, Minn. Stat. § 363A.08, do not apply to her, because "[e]lection to a City Council is a political position, separate and distinct from any employer/employee relationship," and "a City council [member] is not an 'employee' for the purpose of applying the [MHRA]." *Farrington v. City of Richfield*, 488 N.W.2d 13, 16 (Minn. Ct. App. 1992); *see Dennis*, 2024 WL 5508592, at *7-*8 (dismissing the employment-based MHRA counts on that ground). But the City cannot use Ms. Dennis's non-employee status to erase a separate statutory cause of action. She does not seek employee protections under § 363A.08; she invokes the public-services guarantee of § 363A.12, which this Court has already held does not categorically exclude an elected official.

Section 363A.12's reference to "full utilization" fits Ms. Dennis's theory precisely. Her claim is not confined to outright exclusion from a meeting; it is that the City's conduct prevented her from fully communicating, deliberating, meeting with staff, obtaining information, and otherwise functioning on the same footing as her nondisabled colleagues. The Court has already read her claim that way, describing her allegations that the City interfered with her "verbal in-person communication," her ability to "meet[ ] with essential City staff," and her "access[ ] ... [to] once easily accessible information," and that the censure limited her ability to speak with City employees and to "[o]btain[ ] accurate and timely information." *Dennis*, 2024 WL 5508592, at *9-*10. The federal elected-official decisions discussed above give that guarantee concrete content: an elected board member denied equal participation through the failure to accommodate her communication needs,

*Hernandez*, 2024 WL 3011177, at *1, and a council member who could not participate and vote through the City's ordinary procedures, *Silver*, 470 F. Supp. 3d at 623-24. Those cases do not construe the MHRA, but they illustrate the kind of "full utilization" § 363A.12 secures here. Whether Ms. Dennis in fact received full utilization of the functions of her office comparable to nondisabled council members is a disputed, record-bound question for the jury.

## II. GENUINE DISPUTES OF FACT PRECLUDE SUMMARY JUDGMENT ON THE FAILURE-TO-ACCOMMODATE CLAIM

Plaintiff's position is that meaningful access is measured against what nondisabled colleagues enjoy, not by whether Ms. Dennis was physically present; that the City's own authority makes meaningful access a fact-intensive jury question; and that the record contains evidence from which a jury could find the City's accommodations inadequate. That Ms. Dennis continued to attend, speak, and vote does not resolve the claim, because the question is whether she had access and full utilization comparable to her peers, not whether she was in the room. *See Segal v. Metro. Council*, 29 F.4th 399, 404-05 (8th Cir. 2022).

The City argues, in the alternative to coverage, that it provided meaningful access as a matter of law. It contends that the comparison is practical access relative to non-disabled persons rather than a plaintiff's preferred accommodation, Defs.' Mem. 23-24 (citing *Segal* and *Loye*); that it granted numerous accommodations and denied only a Council-wide hourly recess, Defs.' Mem. 24-26; that the hourly recess was unreasonable and an undue hardship because it would lengthen meetings and disrupt Council functions,

Defs.' Mem. 24-25; that an occasional missed vote while stepping out is "an ordinary feature of Council proceedings," Defs.' Mem. 26-27; and that it need not accommodate Ms. Dennis's "preferred communication methods," relying on its retained expert, Defs.' Mem. 27-28.

The City is wrong because its own legal standard makes this a jury question. The controlling inquiry is whether Ms. Dennis had meaningful access comparable to her non-disabled colleagues, not whether the City offered a menu of options, and on that the City's own authority is decisive: at summary judgment courts "examine whether meaningful access was provided to a disabled individual by comparing the service provided to non-disabled individuals," and "whether [a plaintiff] was provided meaningful access ... is a fact-intensive issue, and one that is to be determined by a jury." *Segal v. Metro. Council*, 29 F.4th 399, 404-05 (8th Cir. 2022); *see also Loye v. County of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010). This Court has already applied that principle in this case, holding that the City's proffered accommodations "create fact questions about what a 'reasonable' accommodation is such that 'meaningful' access to the same benefits and participation has been preserved," and that "[s]uch questions belong to much later procedural moments." *Dennis*, 2024 WL 5508592, at *11.

The record confirms the dispute. The interactive-process chronology alone raises a jury question: Ms. Dennis sought accommodations in 2021; by late October 2022 the process had stalled, and she reported that she "hadn't heard anything in a month" (Pl. Ex. 5); on December 20-21, 2022 the City declared the process "conclude[d]" (Pl. Ex. 4); she then submitted a new June 1, 2023 Mayo Clinic letter; and on October 12, 2023, more than

ten months after declaring the process complete, the City issued an "updated" accommodation letter (Pl. Ex. 6). A jury could infer from that sequence that the accommodations were a shifting, contested target rather than the settled package the City now describes.

The experts squarely conflict, which by itself defeats summary judgment. The City's retained expert, Dr. Steiner, opines that Ms. Dennis's medical records did not identify a clinically supported need for unrestricted staff access, for exemption from standard communication boundaries, or for a requirement that others modify their communication style. Defs.' Mem. 28 (citing Pl. Ex. 8). Ms. Dennis's treating clinician, who unlike Dr. Steiner actually treated her, opines the opposite: that the City's restrictions denied her meaningful access, and that her communication needs are a function of her disability rather than a mere preference. (Pl. Ex. 7.) On summary judgment the Court "may not ... weigh the evidence" or choose between these competing opinions. *Anderson*, 477 U.S. at 255.

The City's specific points do not change the result. Plaintiff does not contend that a Council-wide hourly recess was necessarily a required accommodation; but even setting that request aside, a jury could find the accommodations the City did provide were not meaningful. The City acknowledges that Ms. Dennis missed votes when she stepped out during meetings, *see* Defs.' Mem. 26-27, and the censure then forced her staff communications into a written, copied-to-the-Administrator channel that cut against the verbal, direct communication her disability required (Pl. Ex. 11). A jury could find that the City did not merely fail to accommodate her but affirmatively countermanded the accommodations it had promised. Undue hardship is an affirmative defense on which the

City bears the burden, *see* Defs.' Mem. 24-25, and whether an hourly stop would in fact have disrupted meetings that already included breaks is disputed. Whether missed votes were merely "ordinary" or instead marked a denial of meaningful access is the fact question *Segal* reserves for the jury. *See Hooper v. City of St. Paul*, 2019 WL 4015443, at *6 (D. Minn. Sept. 6, 2019) (Schiltz, J.).

## III. GENUINE DISPUTES OF FACT PRECLUDE SUMMARY JUDGMENT ON THE INTENTIONAL-DISCRIMINATION CLAIM

Plaintiff's position is that the record contains both direct and circumstantial evidence that the City acted because of Ms. Dennis's disability, which is a quintessential jury question.

The City argues that Ms. Dennis has no direct evidence linking discriminatory animus to any challenged decision and cannot make a circumstantial prima facie case under *McDonnell Douglas*. Defs.' Mem. 29-32 (citing *Peebles* and *Audette*). It contends that the restrictions merely required Ms. Dennis to follow the same governance structure as everyone else, and that its actions were driven by her conduct, secret recordings, use of staff time for personal grievances, and rule violations, rather than by disability; it adds that its willingness to engage in the interactive process and grant accommodations is inconsistent with animus. Defs.' Mem. 30-32.

The City is wrong because the record supplies exactly the evidence it says is missing. Direct evidence requires "a specific link between the alleged discriminatory animus and the challenged decision." *Audette v. Lake of the Woods County*, 183 F.4th 627, 637 (8th Cir. 2026) (cited at Defs.' Mem. 29). The City's own emails supply that link: City

Attorney Michael Spindler-Krage, who advised on the censure and the behavior policy, in his August 19, 2022, email branded Ms. Dennis's documented disability as merely "claimed" and faulted her physician's letter for lacking an "explicit diagnosis," and he tied her medical documentation directly to her "conduct." (Pl. Ex. 1 (Aug. 19 and Sept. 1, 2022 emails).) A jury could find that this reflects hostility toward the disability itself and that it motivated the discipline that followed.

The record contains a second, independent piece of direct evidence. On March 20, 2023, the City Attorney reached into Ms. Dennis's family-court file and circulated to the City Administrator, two Deputy City Administrators, and the Council President the portions of her divorce order finding that the court did "not find Mother credible that her outbursts are solely related to her ADHD diagnosis" and that "Mother can control her outbursts." (Pl. Ex. 9.) A decisionmaker who retrieves a Council member's private, disability-related court records and forwards to City leadership a judicial finding discounting her disability supplies a direct link between disability animus and the discipline that followed; that the same conduct could be described as volitional does not neutralize it but frames the very jury question of motive. That the City's own censure "examples" separately catalog her "divorce" and "harassment restraining order" (Pl. Ex. 3) confirms that her disability and its manifestations were central to, not incidental to, the decision to punish her.

The circumstantial evidence is equally strong. No other Council member, disabled or not, received a disability-specific "behavior policy" of the kind directed at Ms. Dennis (Pl. Ex. 1). Ms. Dennis also states that other members she regarded as more disruptive went

undisciplined; whether that comparison ultimately holds is for the jury, but the point that does not depend on her characterization is that the behavior policy singled her out. The "Censure Examples" document, the City's own catalog of the conduct supposedly justifying the censure, is dated two weeks after the censure was imposed (Pl. Ex. 3), from which a jury could infer that the stated reasons were assembled to support a decision already made, which is evidence of pretext. The City's conduct-not-disability theory does not resolve the case, because where the challenged conduct is itself a manifestation of the disability, whether the City acted "because of" rather than "in spite of" Ms. Dennis's disability is precisely the intent question reserved for trial. *See Peebles v. Potter*, 354 F.3d 761, 766-68 (8th Cir. 2004). Ms. Dennis's treating clinician opines that the conduct the City punished is a manifestation of her disability, directly disputing the City's retained expert on that point. (Pl. Ex. 7.) A jury crediting that opinion could find the City punished Ms. Dennis for the disability itself. The City's argument that its interactive-process efforts negate animus is, at most, a competing inference, not a basis for judgment as a matter of law.

The City's reliance on the Goering investigation does not change the analysis. After Ms. Dennis complained that the censure was discriminatory, the City retained an investigator, Ann Goering, who concluded that the restrictions resulted from Ms. Dennis's conduct, tracked the Council Rules, and were not discriminatory. *See* Defs.' Mem. 10. That report is not a finding that binds the jury. It was commissioned and paid for by the City to review the City's own conduct; it postdates the March 2023 censure and the family-court email and could not undo them; and it did not have before it the opinions of Ms. Dennis's

treating clinician or the full summary-judgment record now before the Court. At most it supplies the City's own view of its motive, which a jury is free to weigh against the contrary evidence and to reject. It does not establish the absence of a genuine dispute.

## IV. GENUINE DISPUTES OF FACT PRECLUDE SUMMARY JUDGMENT ON THE MHRA REPRISAL CLAIM

Plaintiff's position is that a jury could find the City subjected Ms. Dennis to a materially adverse course of conduct because of her complaints of discrimination.

The City concedes, for purposes of this motion, that Ms. Dennis engaged in protected activity. Defs.' Mem. 33. It argues instead that she cannot show a materially adverse action or causation. It characterizes the ride-along restrictions, office relocation, meeting changes, and communication restrictions as "ordinary operational decisions" rather than reprisals, Defs.' Mem. 33-36; separately defends the City Attorney's conduct, his role in the censure, his review of Ms. Dennis's family-court records, and his written-questions requirement, as ordinary legal advice and professional boundary-setting, Defs.' Mem. 35-36; dismisses her reputational-retaliation allegations as speculation and hearsay, Defs.' Mem. 36-37; and argues no causation, both because the intervals are too long under *Sisk* and because intervening misconduct broke any causal chain, Defs.' Mem. 37-39.

The City is wrong at each step, beginning with the standard it applies. The City argues that its actions deprived Ms. Dennis of no "right, entitlement, or tangible benefit," and it relies on cases requiring an adverse employment action. Defs.' Mem. 33-34 (citing *Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir. 2000), and cases holding that relocation and exclusion from meetings are not adverse employment actions). That is the

wrong yardstick. The MHRA reprisal standard is the retaliation standard, not the ultimate-employment-action test: an action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). That standard reaches conduct beyond the terms of a job, is context specific, and is not limited to ultimate actions. The City cannot demand that Ms. Dennis prove an adverse employment action while insisting, as it does throughout its motion, that she was never its employee. Nor can it defeat the claim by picking the challenged acts apart one at a time, because the retaliation inquiry asks whether the conduct, viewed in its cumulative context, would dissuade a reasonable person, not whether any single act suffices "standing alone." A jury could find that a sustained course of conduct restricting Ms. Dennis's access to staff and information, including the censure's restrictions confining her staff meetings to virtual meetings, limiting the staff she could contact, and requiring her written communications to staff to be copied to the City Administrator (Pl. Ex. 11), together with further restrictions singling her out, well might have dissuaded a reasonable official from complaining of discrimination. *See Martinson v. ABM Parking Servs.*, 2015 WL 4771574, at *5 (D. Minn. Aug. 12, 2015) (Schiltz, J.). The same is true of the City Attorney's conduct: whether searching a sitting Council member's private family-court file, circulating its contents to City leadership under the subject line "your children," questioning her fitness as a mother, and imposing a written-questions-only rule are benign boundary-setting or materially adverse retaliation is for the jury, not the City's characterization. (Pl. Ex. 9.) Plaintiff does not rest her reprisal claim on the disputed reputational allegations; the claim is anchored in the documented restrictions on

Ms. Dennis's access, and any reputational evidence is at most residual, with its admissibility a question for trial.

Causation is supported by more than timing, and the sequence itself is telling. Ms. Dennis first complained of disability discrimination in the summer of 2022; the City issued written "parameters" after the July 20, 2022, meeting; it declared the interactive process "concluded" in December 2022; the Council censured her on March 6, 2023; the City Attorney circulated her family-court file and compiled the censure "examples" on March 20, 2023; and the routing, written-questions, and staff-access restrictions followed. The City argues the intervals are too long, Defs.' Mem. 37-39 (citing *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900-01 (8th Cir. 2012)), but Ms. Dennis does not rely on timing alone; the same disability-animus evidence discussed above (Pl. Ex. 1) supplies the additional evidence of retaliatory motive that *Sisk* requires.

The City's intervening-misconduct theory does not resolve the claim. The City contends that Mayor Norton stopped meeting one-on-one with Ms. Dennis because Ms. Dennis had recorded their conversations and sent a recording to the press. Defs.' Mem. 12. But Mayor Norton learned of that recording in mid-2023 (Defs.' Mem. 12), after the March 6 censure and the March 20 family-court email that anchor Ms. Dennis's claim; conduct the City had not yet discovered cannot explain the earlier restrictions. At most the recording supplies a later, competing justification for a subset of the challenged conduct, which makes motive a mixed question for the jury rather than a basis for judgment as a matter of law. Whether the City's stated reasons are the real reasons, or a pretext for retaliation, is for trial.

## V. MAYOR NORTON AND THE CITY ARE NOT ENTITLED TO SUMMARY JUDGMENT ON IMMUNITY

Plaintiff's position is that the immunity defenses turn on Mayor Norton's motive, which is genuinely disputed, and therefore cannot be resolved on summary judgment.

The City argues that Mayor Norton is entitled to official immunity because her decisions about whether and how to meet or communicate with Ms. Dennis were discretionary, and that absent a willful violation of a known right there is no malice. Defs.' Mem. 40-41. It further argues that the City is entitled to statutory discretionary immunity under Minn. Stat. § 466.03, subd. 6, because those decisions were policy-level judgments about governance and City operations. Defs.' Mem. 41.

Both defenses fail on this record. Official immunity does not protect a public official who acts with malice, meaning "the intentional doing of a wrongful act without legal justification or excuse." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991); *see Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). Where, as here, the record supports an inference of disability-based animus and retaliatory motive, whether Mayor Norton acted with malice is a fact question that forecloses immunity at this stage. Statutory immunity under Minn. Stat. § 466.03, subd. 6 is narrower than the City suggests: it protects planning-level policy choices, not operational conduct, and it does not shield conduct undertaken in bad faith. Whether the decisions here were protected policy judgments or unprotected operational and bad-faith acts likewise turns on the disputed motive evidence.

## VI. THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES

Plaintiff's position is that each challenged category of damages presents fact questions of deliberate indifference and causation that belong to the jury.

The City argues that, even if it is liable, three categories of damages fail as a matter of law: compensatory ADA damages, because there is no deliberate indifference, Defs.' Mem. 41-42 (citing *Meagley*); lost-election or lost-office damages, because causation would require the jury to speculate about how voters would have voted, Defs.' Mem. 42-43 (relying on *Pavek* and *Carmody*); and future lost-income or earning-capacity damages, because Ms. Dennis cannot identify an employer that declined to hire her, Defs.' Mem. 43-44.

The City is wrong on each. Compensatory damages under the ADA require deliberate indifference, which may be inferred where a public entity acts with knowledge that harm to a federally protected right is substantially likely and fails to act on that likelihood. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (cited at Defs.' Mem. 42). Although the City did provide some accommodations, the delay in the interactive process, the reopening of a process the City had declared complete, and the contemporaneous skepticism toward Ms. Dennis's disability would permit a reasonable jury to find that the City consciously disregarded a strong likelihood that its conduct would deny her meaningful access. Deliberate indifference is ordinarily a fact question, and it is one here.

On the remaining categories, Plaintiff does not rest her damages case on the lost election, and the Court need not reach the election theory to deny summary judgment. Ms. Dennis's most concrete injuries are independent of any prediction about the 2024 vote: her exclusion from the full functions of her office during her term, and the harm her treating clinician attributes to the City's conduct (Pl. Ex. 7). Where a wrong has caused injury, uncertainty about the precise amount does not bar recovery. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-65 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Plaintiff accepts that *Pavek v. Simon*, 467 F. Supp. 3d 718, 752 (D. Minn. 2020), holds that the loss of an election is not itself compensable, and she does not ask the jury to award the value of the Council seat; loss of office is at most one item of reputational and economic harm, not the foundation of her damages claim. And *Carmody v. Kansas City Bd. of Police Comm'r*, 713 F.3d 401, 407 (8th Cir. 2013), addresses the sufficiency of a damages estimate at trial, not whether recoverable damages exist. Those recoverable categories present fact questions of causation and amount for the jury.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated: September 26, 2026

Respectfully submitted,

**QUANTUM LEX PA**
*/s/ John Hayden*
John Hayden (#504136)
6800 France Ave S, Ste 405
Edina, MN 55435
(952) 746-2400
jhayden@quantumlex.io

**OSTROW LAW LLC**
Paul T. Ostrow (#151889)
2239 Arthur Street NE
Minneapolis, MN 55418
(612) 239-8612
ptojustice@gmail.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum complies with the type-size limitation of D. Minn. LR 7.1(h) and the word limit of D. Minn. LR 7.1(f)(1) for a memorandum of law regarding a dispositive motion. The memorandum is set in Times New Roman, a proportional font, in a type size of 13 points, including any footnotes. This memorandum was prepared using Microsoft Word for Microsoft 365, and, in reliance on the word-count function of that software, the memorandum contains 8,058 words, which is fewer than the 12,000 words permitted by LR 7.1(f)(1)(A). This count includes all text and headings and excludes the caption, signature blocks, and this certificate.

Dated: September 26, 2026 /s/ John Hayden

John Hayden (#504136)
Attorney for Plaintiff